**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, and its LOCAL UNION NO. 769, Respondents.**

No. 21407.

United States Court of Appeals
Ninth Circuit.

Dec. 11, 1968.

---

Gary Green (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Charles W. Henderson, Director, N. L. R. B., Albuquerque, N. M., for petitioner.

Louis Sherman (argued), of Sherman & Dunn, Washington, D. C., Dushoff & Sacks, Phoenix, Ariz., Feldman & Waldman, Littler, Mendelson & Saltzman, San Francisco, Cal., for respondents.

Before HAMLIN, KOELSCH and BROWNING, Circuit Judges.

KOELSCH, Circuit Judge.

This proceeding, commenced by the N. L. R. B. to enforce an order against the IBEW and its affiliated Local 769, concerns several of the secondary boycott provisions of the National Labor Relations Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 158.

Briefly, the trial examiner's findings, approved by the Board, were substantially as follows:

For many years the IBEW and its affiliated locals have maintained collective bargaining relationships with Ets-Hokin, a general and electrical construction firm. During the period covered by this proceeding Ets-Hokin was party to labor agreements with a number of IBEW locals relating to work on construction jobs throughout the United States, including one with Local 769, whose territorial jurisdiction extended over the U. S. Bureau of Reclamation Glen Canyon Dam project in Northern Arizona. All of them contained the following clause (or one essentially the same):

"Local Union #___ is a part of the International Brotherhood of Electri-

cal Workers and any violation or annulment of working rules or agreements of any other Local Union of the IBEW, or the subletting, assigning, or transfer of any work in connection with electrical work to any person, firm, or corporation not recognizing the IBEW as the collective bargaining representative on any electrical work in the jurisdiction of this or any such Local Union by the Employer, will be sufficient cause for cancellation of this agreement, after the facts have been determined by the International Office of the Union."

In October 1962 Ets-Hokin subcontracted to Rose Construction Co. part of the electrical installation work on the Glen Canyon project. Soon afterward Rose entered into a collective bargaining agreement with a non-IBEW union which recognized that union as the representative of its laborers and provided wage scales below the minimum fixed both in Ets-Hokin's bargaining agreement with Local 769 and its prime contract with the U. S. Bureau of Reclamation.

During the period from January through March 1963 Local 769 and the International (hereafter Respondents) repeatedly complained to Ets-Hokin concerning the subcontract, objecting particularly to the fact that Rose was dealing with a rival union and was paying sub-minimum wages. Pointing to the termination clause in their own bargaining agreements, Respondents threatened to terminate the Local 769 bargaining agent and assured Ets-Hokin that all other IBEW locals would do the same, unless Ets-Hokin immediately took Rose off the job. Ets-Hokin sought to effect some accommodation, but Respondents stubbornly refused, flatly rejecting all proposals and requests. When Respond-

ents fixed a deadline Ets-Hokin capitulated and, after settling with Rose, undertook the work itself.

On these facts the Board concluded that Respondents violated sections 8(b) (4) (B), 8(e) and 8(b) (4) (A) of the National Labor Relations Act, 29 U.S.C. § 158. [Ets-Hokin Corp., 154 N.L.R.B. 839 (1965)].

██ 1. *The 8(b) (4) (B) Violation*

In pertinent part section 8(b) (4) (B) makes it an unfair labor practice for a union "to threaten, coerce or restrain any person engaged in commerce * * * where * * * an object thereof is * * * forcing or requiring any person * * * to cease doing business with any other person * * *."

The trial examiner's finding that Respondents were seeking secondary boycott action is fully supported. Several witnesses gave testimony tending to show that Respondents demanded Ets-Hokin cease doing business with Rose; they also stated in substance that Respondents objected to a non-IBEW employer on the job; that Respondents flatly rejected all Ets-Hokin's requests to make some concession that would enable Rose to hire IBEW members; that Respondents repeatedly declared Rose was ineligible for an IBEW agreement and warned Ets-Hokin that its own agreements would be terminated if Rose stayed.[1]

Likewise, we are satisfied that the evidence fully warrants the examiner's factual conclusion that Respondents' warning, in the circumstances of this dispute, constituted a threat prohibited by Sec. 8(b) (4).

"The statute in its present form deals with secondary boycotts and its provisions are not restricted to the use of

---

1. Respondents contend that the reason they threatened to terminate the IBEW contracts was because Ets-Hokin had breached the obligation imposed by the Davis-Bacon Act (40 U.S.C. 276a) to make Rose pay the minimum wages prescribed in the prime contract. Although some evidence indicates that Respondents objected to the sub-minimum wages, substantial evidence supports the Board's conclusion that an object, if not the sole object of the threat, was for a purpose proscribed by 8(b) (4). See N.L.R.B. v. Denver Bldg. & Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

force or violence as a means of bringing pressure against the secondary employer, but includes economic sanctions also." N. L. R. B. v. Local 825, Int'l Union of Operating Engineers, 315 F.2d 695, 697 (3d Cir. 1963). Nor are the latter limited to strikes and picketing. As the Supreme Court has said in N. L. R. B. v. Fruit and Vegetable Packers and Warehousemen, Local 760, 377 U.S. 58, 68, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), "the prohibition of § 8(b) (4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise." Thus, even granting that the record is totally lacking in evidence direct or circumstantial that Respondents themselves would have followed the termination by economic action against Ets-Hokin, it does contain proof which if viewed realistically tends to show that termination would have set in motion a chain reaction attributable to them which had that effect. In a brief filed with the Board, Respondents, in arguing that it would be improper to infer that a strike action would follow termination of the agreement, said:

"Because the so-called annulment clause contained in the IBEW's contract with Ets-Hokin was repeated in the union's agreements with other contractors, cancellation of the Ets-Hokin agreement would have immediately made that company an ineligible business associate in the eyes of these other contractors. Thus, whether or not the union continued to refer workmen to Ets-Hokin in a position where other contractors wishing to comply with their own IBEW agreements would not have made contracts with Ets-Hokin. Under such circumstances, there was no motivation for the union to take the strike action the General Counsel considers inevitable."

We are not impressed with Respondent's argument that cancellation could only "affect" Ets-Hokin as a subcontractor and, this being so, no adverse consequences could be inferred even if the threat was carried out because the record showed only that during the initial period Ets-Hokin was a prime contractor for "numerous large U. S. or State governmental enterprises and numerous large private enterprises throughout the United States." Prime contractors, whose freedom to engage subcontractors is curtailed, suffer economically in much the same manner as subcontractors who are prevented from securing work.

## 2. *The 8(e) Violation*

Section 8(e) makes it an unfair labor practice for a union and an employer to enter into a secondary boycott agreement and declares such an agreement unenforceable and void; it contains two provisos, one of which, often referred to as the "construction industry proviso," excepts from the general operation of the section a secondary agreement in that industry which relates to on-site construction.

The Board recognized that the IBEW agreement was one in the construction industry and that the secondary boycott agreement therein related to the matter of on-site construction. But it nevertheless concluded that the terms of the agreement exceeded the scope of the proviso and to that extent was not saved. We agree.

In the so-called *Sand Door* decision [Local 1976, United Brotherhood of Carpenters v. N. L. R. B., 357 U.S. 93, 78 S. Ct. 1011, 2 L.Ed.2d 1186 (1958)], the Supreme Court held that "hot cargo" agreements cannot be enforced by economic action prohibited by the then existing secondary boycott provision, section 8(b) (4) (A). But it pointed out that 8(b) (4) (A) did not prohibit all forms of union coercion calculated to compel a neutral employer to take secondary action against a primary employer. Rather it merely forbade a union to induce the neutral's employees to engage in a strike or refuse to handle the unfair employer's goods and left the union free to "approach an employer to persuade him to engage in a boycott. * * *" (357 U.S. at 99, 78 S.Ct. at 1016). Further, the Court noted that the law nowhere made secondary

boycott agreements unlawful. In the Court's words: "the contractual provision * * * may * * * have legal radiations affecting the relations between the parties." (357 U.S. at 108, 78 S.Ct. at 1020).[2]

By means of the 1959 Landrum-Griffin Amendments Congress moved to close these "major loopholes in the present ban on secondary boycotts." (I Legis.Hist., Labor-Management Reporting and Disclosure Act of 1959 at 475 [hereinafter cited as Legis.Hist.]). It broadened the prohibition of 8(b) (4), making it an unfair labor practice for a union to approach a secondary employer with threats of labor trouble or other economic retaliation as well as to induce his employees to strike. Additionally, Congress moved directly against secondary boycott agreements and enacted section 8(e), which generally prohibited them.

In our view these 1959 amendments clearly reflect a Congressional attitude that unions should have no power over neutral employers to compel secondary action. And even though the construction industry proviso provided a limited relaxation of the general ban against secondary agreements, we are convinced that Congress did not intend to countenance provisions in such agreements that provide for enforcement by means of union coercion or economic pressure.

As we have said, the Supreme Court, prior to these amendments, had held that a union could not resort for enforcement to means prohibited by 8(b) (4) as it was then worded. Congress intended that this result should continue. In the Conference Report accompanying the Bill the committee explained: "The proviso applies only to section 8(e) and therefore leaves unaffected the law developed under section 8(b) (4)." I Legis.Hist. 943.

Furthermore, it appears that Congress intended to limit the enforcement of proviso-saved agreements to judicial means. The Conference Report stated: "It is not intended to change the law with respect to judicial enforcement of these contracts. * * * " I Legis.Hist. 943–44.[3] In light of the Congressional objective of limiting the enforcement of valid hot cargo agreements to judicial means and freeing the contractors from direct economic pressures to enforce such agreements, we agree with the Board that the construction industry proviso may not be read as permitting the inclusion of provisions into a collective bargaining agreement which purport to authorize 8(b) (4) violations.

Respondents contend that the termination clause does not authorize proscribed economic action but merely gives express recognition to the well established legal remedy of unilateral rescission, which arises upon a material breach of contract. Granted that unilateral rescission is a contract remedy, it does not follow that it is not a form of prohibited economic coercion. In an analysis of the Landrum-Griffin bill the then Senator Kennedy and Representative Thompson pointed out one of the evils of union self-help in enforcing a secondary boycott agree-

2. "The *Sand Door* decision was believed by Congress not only to create the possibility of damage actions against employers for breaches of 'hot cargo' clauses, but also to create a situation in which such clauses might be employed to exert subtle pressures upon employers to engage in 'voluntary' boycotts." National Woodwork Mfgs. Assn. v. N.L.R.B., 386 U.S. 612, 634, 87 S.Ct. 1250, 1263, 18 L.Ed.2d 357 (1967).

3. See also N.L.R.B. v. Int'l Bhd. of Elec. Workers, Local Union 683, 359 F.2d 385 (6th Cir. 1966) ; Building and Constr. Trades Council of San Bernardino and Riverside Counties v. N.L.R.B., 328 F.2d 540 (D.C.Cir. 1964) ; Orange Belt Dist. Council of Painters v. N.L.R.B., 328 F.2d 534 (1964) ; enf'd subsequent to Bd's dec. on remand, 124 U.S.App.D.C. 349, 365 F. 2d 540 (D.C.Cir. 1966) ; N.L.R.B. v. Muskegon Bricklayers Union No. 5, Bricklayers, Masons and Plasterers International Union of America, 378 F.2d 859 (6th Cir. 1967) ; N.L.R.B. v. Local 217, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U. S. and Canada, 361 F.2d 160 (1st Cir. 1966).

ment: "The cost of noncompliance would undoubtedly be the [union's] insistence that the contract had been terminated, thus freeing the union to present new demands in collective bargaining." (II Legis.Hist. 1708). Thus, viewed in the context of labor-management relations, a termination provision is clearly a means of economic pressure for enforcement.

### 3. The 8(b) (4) (A) Violation

■ Section 8(b) (4) (A), so far as pertinent, makes it an unfair labor practice for a union to corece an employer to "enter into" an agreement prohibited by Sec. 8(3). In reaching the conclusion that Respondents violated this provision the Board, relying on its decisions in Los Angeles Mailers Union No. 9, 135 N.L.R.B. 1132, enforced, 114 U.S.App.D.C. 72, 311 F.2d 121 (D.C.Cir.1962) and Dist. No. 9 Int'l Assn. of Machinists, 134 N.L.R.B. 1354, enforced, 114 U.S. App.D.C. 287, 315 F.2d 33 (D.C.Cir. 1962), reasoned that the phrase "to enter into" as used in the section included the reaffirmation of an existing agreement as well as its execution initially.

In *Mailers* the Board opined that the language, as well as the legislative history of the 1959 amendments, manifests a Congressional intention not only to prohibit all forms of hot cargo agreements but to render them utterly impotent as a means of applying economic pressure against secondary employers and that the phrase to enter into should be broadly construed to effect that goal. By way of illustration the Board, noting Sec. 8(b) (4) (A) and the congressional intention "to close the *Sand Door* loophole by *inter alia* making it unlawful for a labor union successfully to persuade an employer to 'live up to' a hot cargo agreement," the Board pointed out that:

> "To give the cited phrase the narrow meaning urged by the Examiner would, to a considerable extent, defeat the congressional intent to ban all forms of existing hot cargo arrangements. * * * [I]f an employer and a union agreed orally or in writing to a hot car-

go arrangement during the 6 months preceding the filing of an unfair labor practice charge, they would clearly violate Section 8(e). On the other hand, under the holding of the Trial Examiner, if during the relevant 6-month period, the contracting parties only reaffirmed the continued validity of a hot cargo arrangement executed more than 6 months previously, as when a union persuades the employer to live up to such arrangement, there would be no violation of Section 8(e). It would seem that, from the standpoint of the public policy evidenced in the statute and the legislative history, a reaffirmation of an old hot cargo clause or the execution of a new hot cargo clause is equally bad. There is no legislative history to which we have been referred which indicates that Congress intended disparate treatment for substantially identical conduct." (135 N.L.R.B. at 1135–36).

We are persuaded by the Board's reasoning and convinced that its construction of the phrase is warranted. The D.C. Circuit has likewise approved the Board's rationale and in its opinion granting enforcement of the order has succinctly said: "To seek to give it [i. e., a hot cargo clause] life is in substance to seek to have it agreed to, which is no different in substance from seeking to have it entered into." Los Angeles Mailers Union No. 9 v. N.L.R.B., 114 U.S.App.D.C. 72, 311 F.2d 121, 123 (D.C. Cir.1962). At least two other Circuits have expressed like views: N. L. R. B. v. Milk Wagon Drivers Union, Local 753, 335 F.2d 326, (7th Cir.1964); N.L.R.B. v. Local Union No. 28, Sheet Metal Workers Intern. Assn., 380 F.2d 827 (2d Cir. 1967).

We are not unmindful that *Mailers* did not involve a construction proviso agreement but if, as we have concluded, construction agreements come within the ban of Sec. 8(e) when they provide for enforcement by proscribed means, then it appears to us that the Board's rationale is equally applicable to them.

The order will be enforced.