Accordingly, the judgment of the district court is

Affirmed.

**ACCO CONSTRUCTION EQUIPMENT, INC., et al., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 12, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 73-2224 and 73-2431.**

United States Court of Appeals, Ninth Circuit.

Jan. 20, 1975.

Paul, Hastings, Janofsky & Walker, Leonard S. Janofsky, Paul Grossman, Los Angeles, Cal. (argued), for petitioners (Charging in 74–2431).

Robert M. Simpson, Rose, Klein & Marias, Los Angeles, Cal. (argued), for intervenor (petitioner in 74–2431).

Michael Winer of N.L.R.B. (argued), Washington, D. C., for respondent N.L.R.B.

Before HUFSTEDLER and CHOY, Circuit Judges, and McNICHOLS,* District Judge.

## OPINION

CHOY, Circuit Judge:

This labor dispute concerns the validity of a hot cargo clause in a collective bargaining agreement between Local 12 of the International Union of Operating Engineers and several associations representing building contractors in the San Diego and Los Angeles areas.[1] The agreement, which encompasses nearly

---

* Honorable Ray McNichols, United States District Judge for the District of Idaho, sitting by designation.

1. The Associations located in the San Diego area are: Associated General Contractors of America, San Diego Chapter, Inc., the San Diego Building Contractors Ass'n., and the .

Engineering & Grading Contractors Ass'n., Inc., San Diego Chapter.

Those in the Los Angeles area are: Associated General Contractors of California, Inc., the Engineering & Grading Contractors Ass'n., Inc., and the Building Industry Ass'n. of California, Inc.

10,000 employers, restricts the freedom of the contractors to employ non-union heavy equipment repairmen for, primarily, postwarranty repair work. Under the terms of the agreement all repairs and servicing done "on or near the job-site" on new equipment owned for more than 180 days and used equipment owned for more than 30 days [2] must be performed by a member of the Operating Engineers.[3]

Traditionally, the seller of the equipment has been called upon for servicing and repair. Though most equipment dealers in Southern California are not unionized, the union for years has been quietly content to permit contractors to utilize dealers despite the presence of variants of this hot cargo clause in successive labor-management contracts. However, coincident with an Operating Engineers' drive to organize the dealers in 1969, the union began to enforce the clause by assessing fines, under the grievance provisions of the agreement, against a few contractors [4] and threatening others with the same penalty. Charges were then brought before the National Labor Relations Board by certain equipment dealers.

■ The Board found the clause to have the intended hot cargo effect of restricting the contractors from using the services of secondary employers—the dealers. Such provisions are normally forbidden by § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), quoted in pertinent part in the margin.[5] The union does not here contest that. However, it does contend that the agree-ment is protected by the "construction proviso" to § 8(e):

> *Provided,* That nothing in this subsection [(e)] shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

The Board disagreed, finding that on-site heavy equipment repair was not such an integral part of the construction process as to be within the proviso. Furthermore, the Board found that the union assessed penalties and threats thereof constituted unlawful assertions of economic pressure in violation of § 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(B). That provision makes it an unfair labor practice

> to threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person
> . . . ..

However, the Board declined to order the union to repay the fines actually levied.

The case is here on the petition of the union to review the Board's order, the cross petition of the Board to enforce its order, and the petition of those contractors penalized to review that portion of

---

2. These are about the same as the typical warranty periods.

3. There was also a supplementary provision mandating that there be a union helper to assist the dealer's repairman for on-site servicing performed within the warranty period. It has the same secondary impact as the clause described in text and thus rises or falls with that clause.

4. There were five fines, levied from August, 1970 to January, 1971, each of about $60 as specified in the agreement. Four of the contractors penalized paid the fines: Frank

Kunze, Pollock Excavating, Inc., Febbraro Corp., and Daley Corp.

5. It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void.

the order denying restitution of the fines. We enforce the Board's order except that we direct it to order refund of the fines.

### The § 8(e) Charge

 In order to better understand this issue, it will be helpful to give an abbreviated sketch of the manner in which dealers service heavy construction equipment.[6] When a dealer's repairman is dispatched to a construction site, he makes an initial diagnosis. If the trouble is minor, the repair is performed on the site, though often away from the construction activity. For the most part, these visits are of rather short duration. If the problem is major, as it often is, the machinery is removed to the dealer's shop. In addition, field repair is frequently performed after the construction laborers have quit for the day—during "down time"—so as to minimize disruption of the project. The significance of all this, as the Board found, is that repairmen work alongside other laborers infrequently and for brief times only.

To the union, this does not matter. Its position is simply that the § 8(e) proviso employs a purely physical test: whatever labor is performed *at the site* of the project comes within the protective ambit of the provision.

As the Board recognized, however, this ignores the purpose of the congressional exemption. Although the legislative history of the proviso is ofttimes vague and inconclusive, what does emerge is an underlying congressional concern with minimizing jobsite tension. In contrast to most other industries, a variety of craftsmen employed by different contractors and subcontractors work continuously side by side on construction projects. Where the employees of some are union members and the employees of others are not, there is a potential, or so Congress believed, for jobsite conflict. Hence, "the purpose of the section 8(e) proviso was to alleviate the frictions that may arise when union men work *continuously* alongside nonunion men on the same construction site." Drivers, Salesmen, Etc., Local 695 v. NLRB, 124 U.S. App.D.C. 93, 361 F.2d 547, 553 (1966) (emphasis added).[7] What appears critical is that the potential for conflict is likely to arise only when the non-union laborers are in frequent and relatively close contact with the union craftsmen.[8]

Given this view, it becomes evident that the on-site heavy equipment repair involved here is not the type of activity encompassed by the proviso. As we have outlined, a repairman works only occasionally and for rather brief times on the construction site. As a result, the danger of union, non-union friction or related work disruption is slight.

Comparable is the situation of those who deliver supplies or materials to the jobsite. Probably in part because their contacts with those working on the construction itself were likely to be insub-

---

**6.** The facts, as well as the Board's reasoning, are more fully set forth in the Board's published decision at 204 N.L.R.B. No. 115 (1973).

**7.** *See* Essex County & Vic. Dist. Council of Carpenters v. N.L.R.B., 332 F.2d 636, 640 (3rd Cir. 1964) ("This limited exemption was granted apparently in recognition of problems peculiar to the construction industry, particularly those resulting from sporadic work stoppages occasioned by the traditional refusal of craft unionists to work alongside non-union men on the same project."); Note, Hot Cargo Agreements Under the National Labor Relations Act: An Analysis of Section 8(e), 38 N.Y.U.L.Rev. 97, 110–11 (1963); *cf.* Comment, The Landrum-Griffin Amendments: Labor's Use of the Secondary Boycott, 45 Cornell L.Rev. 724, 753 (1960).

**8.** This reading of the proviso gives credence to all of its wording, not merely the phrase "on the site". As the trial examiner observed, the choice is between a standard which requires only that the work covered by the hot cargo clause be performed on the site, or a standard which also examines whether the work is related to the "construction, alteration, painting, or repair of a building, structure, or other work." The more comprehensive of these recognizes that what is analytically fundamental to the proviso is whether union and non-union laborers will be required to work together for more than brief periods of time.

stantial, Congress exempted them from the proviso.[9] In applying this exemption, for example, the Board has held ready-mix drivers outside the scope of the proviso. *E. g.,* Teamsters, Local 294 (Island Dock Lumber, Inc.), 145 N.L.R.B. 484 (1963), *enforced,* 342 F.2d 18 (2d Cir. 1965). Such drivers usually mix the cement ingredients while on the construction site and then assist in pouring the finished product. Thus they have some contact with those workmen assigned full time to the site. But, like the equipment repairman (who is, in a sense, delivering a service), the contact is neither very regular nor prolonged.

We, therefore, enforce the Board's finding of a § 8(e) violation.

### The § 8(b)(4)(ii)(B) Charge

■ We also think that the Board's finding of a § 8(b)(4)(ii)(B) violation should be enforced. That section limits the means which can be employed to enforce even a lawful hot cargo agreement. Although the means used here—fines via a grievance clause—were part of the industry-union contract, we have held that "the construction industry proviso may not be read as permitting the inclusion of provisions into a collective bargaining agreement which purport to authorize 8(b)(4) violations." NLRB v. International Bhd. of Electrical Workers, 405 F.2d 159, 163 (9th Cir. 1968). Moreover,

in that same case we observed that "Congress did not intend to countenance provisions in [§ 8(e)] agreements that provide for enforcement by means of union coercion or economic pressure." *Id.* Rather, "it appears that Congress intended to limit the enforcement of [even] proviso-saved agreements to judicial means." *Id.*[10] We agree with the Board that this unilateral fining mechanism constitutes a form of coercive economic pressure not judicial in nature.

### Restitution of the Fines

■■ We cannot agree, however, that the fines paid by certain of the contractors need not be refunded. To be sure, the Board has wide discretion over its remedial orders. *E. g.,* Marriott Corp. v. NLRB, 491 F.2d 367, 371 (9th Cir. 1974). But once it was determined that the fines were unlawful, restitution with legal interest should have followed in the absence of some rational ground to the contrary. *See generally* Sheet Metal Workers, Local 223 (Continental Air Filters Co.), 196 N.L.R.B. No. 12 (1972).[11]

On remand the Board shall order refund of these fines unless it has good cause not to do so. Such good cause shall be reported to this court expeditiously; otherwise an amended order complying with this decision shall be prepared and submitted to us for our approval and filing.

---

9. "The proviso does not exempt from section 8(e) agreements relating to supplies or other products or materials shipped or otherwise transported to and delivered on the site of construction." H.Rep.No.1147, 86th Cong., 1st Sess. 39 (1959), *reprinted at* I Legislative History of the Labor-Management Reporting & Disclosure Act of 1959, 943, 1959 U.S.Code Cong. & Admin.News, p. 2511.

10. *See* Sheet Metal Workers, Local 48 v. Hardy Corp., 332 F.2d 682, 686 (5th Cir. 1964);

Orange Belt Dist. Council of Painters v. NLRB, 328 F.2d 534, 537 (D.C.Cir. 1964). *But see* Plumbers, Local 494 (Associated General Contractors), 207 N.L.R.B. No. 58 (1973).

11. The Board's attempt to distinguish this case on the ground that the fines levied there were not part of an agreement is unpersuasive. That is a distinction without a difference.