**ASSOCIATED GENERAL CONTRAC-
TORS OF CALIFORNIA,
INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 73–3354.

United States Court of Appeals,
Ninth Circuit.

March 28, 1975.

John H. Stephens (argued), of Cox, Castle, Nicholson & Weepes, Los Angeles Cal., for petitioner.

Sandra R. McCandless (argued), NLRB, Washington, D. C., for respondent.

## OPINION

Before KOELSCH and KILKENNY, Circuit Judge, and SOLOMON,* District Judge.

SOLOMON, District Judge:

Associated General Contractors of California, Inc. (AGC) appeals a National Labor Relations Board (NLRB) decision [1] which held that the union did not engage in unfair labor practices in violation of Section 8(b)(4)(B) [2] and Section 8(e) [3] of the National Labor Relations Act (NLRA). We reverse.

The Plumbing-Heating and Piping Employers Council of Southern California (the Employers Council) is an association of employers who are plumbing, heating, and piping contractors in the building and construction industry. The primary function of the Employers Council is to negotiate and enter into collective bargaining agreements for its members. Robert J. Ohland, Inc. (Ohland), a plumbing subcontractor, is a member of the Employers Council and is bound by the collective bargaining agreement negotiated by the Employers Council. Ohland was the direct employer of the union members here.

Southern California Pipe Trades District Council No. 16 of the United Association (the District Council) is made up of 17 local unions. It negotiates and administers master collective bargaining agreements for its affiliated local unions. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local No. 494 (Local 494) is a member of the District Council and is bound by the collective bargaining agreements negotiated by the District Council. Ohland employed members of Local 494.

Petitioner AGC is a trade association of employers engaged as general contractors in the building and construction industry. AGC is not a party to the collective bargaining agreement here, nor is its member Stolte, Inc. (Stolte). Stolte was the general contractor who hired Ohland to do plumbing subcontract work.

On September 18, 1969, the Employers Council and the District Council signed a three-year collective bargaining agreement. Section III, paragraph 13 of that agreement provides in pertinent part:

The Employer agrees that all work covered under "Scope of Work" in the P.I.P.E. Specification Guide (Revised Edition), except those items excluded and listed below, including but not limited to, all fabrication and installation work, shall be performed by the Employer under the terms and conditions of this Agreement. In the event any fabrication and/or installation

---

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. 207 NLRB No. 58.
2. 29 U.S.C. § 158(b)(4)(B).
3. 29 U.S.C. § 158(e).

work mentioned in this paragraph 13 has been performed is being performed, or will be performed by anyone other than employees working for Employers in accordance with the provisions of this Agreement, the Employer agrees to pay the equivalent of wages and fringe benefits lost by employees covered by this Agreement, as determined by the Joint Arbitration Board or its Subcommittee, into the Retirement Trust Fund of the Plumbing-Heating and Piping Industry of Southern California within ten (10) days of date of posting of the decision of the Joint Arbitration Board.

This is the so-called work preservation clause.

Section XV, paragraph 82 provides that "All pipe fabricated for specialty units . . . shall be fabricated and installed under the terms of [the collective bargaining agreement]."

Section XV, paragraph 86 provides that when a union representative discovers work being performed which he considers in violation of the collective bargaining agreement, the union may require the employer to stop the contested work for up to 72 hours while the Joint Arbitration Board investigates. After 72 hours, the employer may resume work even if the investigation is not complete. The Board may make an award against the offending employer which "it may deem appropriate" including damages or requiring the employer to "fabricate all material on the jobsite" for some period of time.

In June, 1971, Stolte contracted with National Medical Enterprises, Inc. (National) to construct a hospital in Lakewood, California. Stolte was required by the contract to install, or have installed, eight or nine stainless steel surgical scrub stations which National purchased from Market Forge Company (Market Forge) of Massachusetts. Stolte subcontracted all plumbing work, including installation of the scrub stations, to Ohland.

In March, 1972, when Ohland began to install the scrub stations, Local 494 ordered him to stop work because the scrub stations had prefabricated piping. Ohland stopped work. A representative of Local 494 told Ohland that the only way he could resolve the dispute immediately was to allow the union workers to dismantle and refabricate the piping on the scrub stations. Ohland asked Stolte for permission to allow refabrication, but Stolte refused because the scrub stations were owned and furnished by National. The dispute was submitted to the Joint Arbitration Board.

After three and half workdays had passed without a decision by the Joint Arbitration Board, Ohland, installed the scrub stations without any interference. The Board subsequently decided that Ohland violated paragraph 13 of the collective bargaining agreement when he installed scrub stations with piping and trim fabricated by employees not covered by the agreement. The Board assessed Ohland $557.76—the "equivalent of wages and fringe benefits" not earned by members of Local 494 because of the prefabrication.[4] Ohland paid the assessment.

AGC filed charges with the NLRB against the union for unfair labor practices in violation of Section 8(b)(4)(B) and Section 8(e).

An Administration Law Judge, after a hearing, decided in favor of AGC. He held that the union violated both of these sections of the NLRA when it applied and enforced paragraphs 13, 82 and 86 of the collective bargaining agreement here.

A three-member NLRB panel, with member Kennedy dissenting, rejected the recommended decision of the Administrative Law Judge. The majority held that the union "in resorting to use of the applicable contractual provisions in the situation here did not violate Section 8(b)(4)(ii)(B) of the Act and that the contract as so applied did not violate Section 8(e)."

4. The stainless steel scrub stations made by Market Forge require about one hour to install whereas the older-style scrub stations without prefabricated piping, require about four hours.

We overrule the NLRB decision and hold that the labor practices here were illegal under both of these sections of the NLRA.

In Section 8(b)(4)(B) [5] Congress proscribed labor practices which had an object of "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person. . . ."

In 1959, Congress enacted Section 8(e) to stop the union practice of pressuring employers into so-called "hot cargo" agreements to achieve the secondary objectives proscribed by Section 8(b)(4)(B).

■■ The criterion of legality under both sections is "whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 645, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). Labor practices so addressed are permissible primary labor activity. If an agreement or its maintenance is "tactically calculated to satisfy union objectives elsewhere", it presents an illegal secondary boycott.

■ Congress enacted Section 8(b)(4)(B) and Section 8(e) to shield unoffending employers from union pressures designed to involve them in disputes not their own. Labor Board v. Denver Building Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The other subsections of Section 8(b)(4) were similarly intended to protect employers in the position of neutrals between contending parties. National Woodwork, supra 386 U.S. at 625, 87 S.Ct. at 1258.

■ Whether an agreement or its maintenance constitutes a secondary boycott must be determined by reference to "all the surrounding circumstances." National Woodwork, supra at 644, 87 S.Ct. at 1268. An important factor in this determination is the "right-to-control" test which provides that "if an employer is not legally empowered to meet his employees' demand, then they cannot lawfully strike him for his failure to accede." George Koch Sons, Inc. v. NLRB, 490 F.2d 323, 326 (4th Cir. 1973).

■ Here, Ohland was a neutral, unoffending employer who was drawn into Local 494's dispute with National and Market Forge. Local 494 was not engaged in primary labor activity intended to affect Ohland's labor practices; Ohland did not have and never had the power to accede to the union's demands. Local 494 wanted to force Ohland to pressure Market Forge to cease manufacturing scrub stations with prefabricated piping and to pressure National to either cease purchasing them or to allow them to be dismantled and refabricated.[6]

The union argues that National Woodwork, supra, undercuts the right-to-control doctrine. There, a collective bargaining agreement provided that union members were not required to handle premachined doors. A general contractor, whose building contract would have permitted "blank" doors, ordered premachined doors from National Woodwork. When the union members refused to hang the premachined doors, the general contractor substituted "blank" doors. National Woodwork charged that the agreement and its enforcement violated Section 8(b)(4)(B).

■ The Supreme Court held that the purpose of the contract clause and its enforcement was work preservation, a legitimate union objective. Id. 386 U.S. at 635, 87 S.Ct. at 1263. The union lawfully demanded that the employer cease handling premachined doors. The right-

---

5. This section, originally enacted as Section 8(b)(4)(A) in the Taft-Hartley Act of 1947, was changed to Section 8(b)(4)(B) by the Landrum-Griffin amendments in 1959.

6. These objectives are within the "cease doing business" language of Section 8(b)(4)(B) and Section 8(e). An attempt to cause a significant change in a secondary person's method of doing business constitutes a "cease doing business" objective. NLRB v. Operating Engineers, 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).

to-control issue was not presented because the employer was privileged to use either premachined or "blank" doors.

Under our holding it is possible for an employer to thwart enforcement of a valid work preservation clause by forfeiting his right-to-control or by conspiring with his immediate contractor to create the appearance of no control. *George Koch Sons, supra* 490 F.2d at 328. Here, however, Ohland had no authority to select the type of scrub sinks or to allow dismantling and refabrication of the sinks. The union does not contend that Ohland had this authority, nor was there any evidence of a conspiracy. In fact, the use of the new stainless steel scrub sinks deprived Ohland of profitable work.

Local 494 argues that its objective here was work preservation and that *National Woodwork* authorizes any union activity with that objective. We believe *National Woodwork* must be limited by the right-to-control doctrine. A union's right to enforce a work preservation clause against an employer may extend only to work which is his to assign. When it is applied to work beyond the employer's power to give, a work preservation clause necessarily embodies a prohibited secondary objective.

Even if the work preservation doctrine were applicable, we agree with the Administrative Law Judge that the union's objective here was not work preservation.

The stainless steel surgical scrub stations installed by Ohland were first marketed by Market Forge in 1967. They are an alternative to the old-style porcelain scrub sinks, but they cost much more. These new sinks are scientifically designed to minimize splash, automatically control water temperature and flow, and provide illumination and knee-operated rather than hand-operated faucets. The valves and piping are fabricated and installed by factory personnel. The sinks have sophisticated mechanisms which require precision tooling and alignment. The "on-off" valve is manu-factured to Market Forge's specifications by a valve firm, and Market Forge had to design and build a special jig to attach the valve to the framework.

We agree with the Administrative Law Judge that the Market Forge scrub sink is a new and different product. Fabrication and installation of the special valves and piping in these sinks is not work traditionally and historically performed by onsite plumbers. *National Woodwork, supra,* 386 U.S. at 646, 87 S.Ct. at 1269. The evidence showed that onsite plumbers are not qualified or equipped to do this work.

The union, by applying the work preservation clause in the collective bargaining agreement, was trying to acquire work performed by employees of Market Forge.

In our view, the union's practices here had a secondary objective. This objective is proscribed by Section 8(b)(4)(B) only when unlawful means, such as threats, coercion or restraint, are used to achieve it.

The Administrative Law Judge found that the union had used unlawful means. We agree with him and reject the decision of a majority of the NLRB panel which held that the union's practices did not constitute threats, coercion or restraint because the practices were permitted by the collective bargaining agreement.[7]

The means used here were specified in the collective bargaining agreement. Nevertheless, an agreement cannot authorize Section 8(b)(4)(B) violations. ACCO Construction Equipment, Inc. v. NLRB, 511 F.2d 848 (9th Cir. 1975) (Nos. 73–2224 and 73–2431, January 20, 1975); NLRB v. International Board of Electrical Workers, 405 F.2d 159 (9th Cir. 1968).

We believe that when Congress used "coerce" in Section 8(b)(4)(B) it did not intend to proscribe only strikes or picketing, but intended to reach any form of economic pressure of a compelling or restraining nature. ACCO,

---

**7.** The Board did not reach the secondary boycott issue.

*supra,* at 852; NLRB v. International Brotherhood of Electrical Workers, AFL–CIO, 405 F.2d 159, 162 (9th Cir. 1968), enforcing Ets-Hokin Corporation, 154 NLRB 839, cert. denied, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969); Local Union No. 48 of Sheet Metal Workers International Association v. The Hardy Corporation, 332 F.2d 682, 686 (5th Cir. 1964).

Here, the three and a half day work stoppage and the $557.76 assessment against Ohland had the desired effect of pressuring him to pressure others to change their business practices. Inevitably, no subcontractor who is bound by a provision of the type involved here will install prefabricated scrub sinks unless he has an agreement that he will be reimbursed for assessments and other sanctions levied against him. This practice will influence the business decisions of hospital builders and scrub sink manufacturers. The measures used against Ohland are forms of economic pressure proscribed by Section 8(b)(4)(B).[8] *ACCO, supra.*

The labor practices here also violated Section 8(e). That section makes it an unfair labor practice for a union and an employer to enter into a secondary boycott ("hot cargo") agreement.

■ Paragraph 13 of the collective bargaining agreement may not be illegal on its face, *National Woodwork, supra.* Nevertheless, as applied to the facts of this case, it is illegal because it is a "hot cargo" agreement. Local 494 enforced that clause against Ohland, who was powerless to assign the disputed work to union members.

■ The union argues that its enforcement of paragraph 13 is permissible under the "construction industry proviso" of Section 8(e) which authorizes "hot cargo" agreements involving onsite work in the construction industry.[9]

The construction industry proviso was designed to enable employers and unions to prevent friction between union and nonunion employees on the same jobsite. *ACCO, supra* at 851; Drivers, Salesmen, Etc., Local 695 v. NLRB, 361 F.2d 547, 553 (D.C.Cir.1966); Essex County & Vic. Dist. Council of Carpenters v. NLRB, 332 F.2d 636, 640 (3d Cir. 1964).

Here, there was no such problem. The disputed work was done off the jobsite at the plant of the manufacturer in another state.

We vacate the NLRB decision on the ground that the collective bargaining agreement, as applied and enforced here, violated both Section 8(b)(4)(B) and Section 8(e) of the National Labor Relations Act, and remand the matter to the Board with directions to enter a new order consistent with the views expressed in this opinion.

8. These means, though coercive, are proper when used for primary labor objectives.

9. Neither the Administrative Law Judge nor the NLRB panel reached this question. The Administrative Law Judge, relying on Ets-Hokin Corporation, 154 NLRB 839, 842–843 (1965), enforced sub nom. NLRB v. International Brotherhood of Electrical Workers, AFL–CIO, 405 F.2d 159, 162–164 (9th Cir. 1968), cert. denied, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969), decided that even if paragraph 13 were a legitimate "hot cargo" agreement, the means used to enforce it were unlawful. The NLRB panel held that the means were lawful, but did not consider whether the clause itself was lawful before dismissing the Section 8(e) allegations.