591 F.2d 284
 100 L.R.R.M. (BNA) 2999, 85 Lab.Cas. P 11,157
 ELECTRO-COAL TRANSFER CORPORATION, Plaintiff-Appellant,
v.
GENERAL LONGSHORE WORKERS, I. L. A., LOCAL NUMBERS 1418 AND
1419, and the International Longshoremen's
Association, A.F.L.-C.I.O., Defendants-Appellees.
 No. 76-2133.
 United States Court of Appeals,
Fifth Circuit.
 March 15, 1979.
 
 Robert K. McCalla, New Orleans, La., for plaintiff-appellant.
 Ralph N. Jackson, Victor H. Hess, Jr., Alvin J. Liska, New Orleans, La., for defendants-appellees.
 Seymour Waldman, New York City, for Intern'l Longshore, etc.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before INGRAHAM, GEE and TJOFLAT, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 Electro-Coal Transfer Corporation brought this action for damages under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1976), alleging injury as a result of a secondary boycott by the defendant unions in violation of section 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B) (1976).[1] After a trial to the court, judgment was entered for the defendants, and the plaintiff appealed. We find that a proper decision in this case requires the resolution of additional fact issues not passed upon by the district court and remand the case for further proceedings.
 
 
 2
 * The plaintiff is a Louisiana corporation operating a facility at Davant, Louisiana, on the Mississippi River for the transfer of bulk commodities between river barges and sea-going vessels. Its employees are non-union. Locals 1418 and 1419, General Longshore Workers, ILA, are the certified collective-bargaining representatives for longshoremen in the Port of New Orleans. The locals entered into a collective-bargaining contract, the Deep Sea Agreement (Agreement), with the New Orleans Steamship Association (NOSA), an employers association representing shipping and stevedoring employers of New Orleans in collective bargaining and contract administration with the ILA locals. Plaintiff is not a member of NOSA or in any way bound by the Agreement. Defendant International Longshoremen's Association is the parent of Locals 1418 and 1419 but not itself a bargaining representative or a party to the Agreement.
 
 
 3
 This dispute arose in the first half of 1973 when, as a result of the Russian grain deal, thousands of tons of grain were being shipped through New Orleans, and the port's grain loading facilities were strained to the limit. In early January 1973, Cook Industries, a large grain merchandiser that normally used its subsidiary's unionized facilities to load grain, had Electro-Coal load grain aboard one of Cook's ships. When Clarence Henry, president of Local 1419 and vice-president of defendant International Longshoremen's Association, learned of this, he contacted NOSA and presented a grievance on behalf of both locals that an employer bound by the Agreement, Cook,[2] was violating the Agreement by loading grain at Electro-Coal without using ILA labor. James Howell, president of NOSA, agreed that Electro-Coal's facility was within the geographic coverage of the Agreement[3] and that the Agreement required that when grain was loaded aboard a NOSA member's vessel, ILA labor must be aboard. Howell conveyed the union's grievance to Melvin Hibbits of Cook.
 
 
 4
 Cook had scheduled another ship for loading at Electro-Coal in the middle of January. A few days before the scheduled date, Hibbits called Henry to discuss the problem. Henry said it would be a violation of the Agreement for Cook to load a ship at Electro-Coal without using ILA labor. He rejected an offer by Hibbits to pay the wages and fringe benefits for a full ILA crew that would stay at home while the work was done at Electro-Coal by Electro-Coal's own employees. Henry insisted that an ILA crew had to be on the vessel while it was loaded; the men did not actually have to do the work, but they had to be there. He said there would be "serious problems" if the Agreement was not adhered to, that Cook might find itself without labor at its subsidiary's loading facility at Reserve, Louisiana, and that he might have to go to the Masters, Mates, and Pilots Association to prevent ships from being docked at Electro-Coal. Hibbits had already ascertained that Electro-Coal insisted upon using its own employees and would not permit idle union members aboard ships being loaded at its facility. Accordingly, Cook arranged for the vessel to be loaded elsewhere.
 
 
 5
 Cook then appealed to the White House to intervene. As a result, the president of the international union called Henry and prevailed upon him to reach an accommodation with the employers so the grain could be loaded. An arrangement was worked out whereby NOSA members agreed to pay the locals the wages and benefits that should have been received by union longshoremen without the men actually having to be on board the ships at Electro-Coal.
 
 
 6
 Throughout this period another grain company, Archer-Daniels-Midland (ADM), had been loading ships at Electro-Coal. ADM was not a member of NOSA and not bound by the Agreement. In January 1973, however, ADM had arranged to ship grain in vessels owned by a NOSA member. This vessel and others were loaded at Electro-Coal and ADM agreed to abide by the arrangement with the unions and pay compensation for work that should have been performed in accordance with the Agreement.
 
 
 7
 Ships continued to be loaded at Electro-Coal without incident until June 1973. NOSA and the unions had been unable to agree on the exact formula by which the payments were to be calculated. A meeting was held on June 21, 1973, to arrive at a settlement. Present were Howell for NOSA, Hibbits for Cook, Henry for Local 1419, Alfred Chittenden for Local 1418 and representatives of Bunge Corporation (another grain company member of NOSA), and ADM. Agreement was reached on the payment formula, after which Henry and Chittenden announced that, since a settlement had been made for past loadings at Electro-Coal, violations of the Agreement should cease. The long delay in payment and the extensive use by NOSA members of Electro-Coal's facility had caused unrest among the rank and file union members on the waterfront, they reported, and they were being accused of taking bribes to permit contract violations. They demanded that the Agreement be adhered to in the future and that ships not be loaded at Electro-Coal without ILA labor aboard. As to what was said next, the testimony is in dispute. Hibbits testified that the union officials stated there could be "serious problems" at individual facilities and in the port area as a whole and that they set a deadline of July 15 for the end of contract violations. Hibbits said he took these statements to be threats and immediately cancelled all further Cook loadings at Electro-Coal. All of the other employer representatives at the meeting testified that the union officials did not say what would happen if the Agreement were not adhered to in the future and that no threats or ultimatums were made. ADM also ceased loading grain at Electro-Coal after June 1973.
 
 
 8
 The district court found that no illegal threats were made by the unions. It held that "Locals 1418 and 1419 engaged in protected primary activity, directed solely at enforcing its collection (Sic ) bargaining agreement." Record, vol. 1, at 82. The court found it significant that no attempt was ever made to displace Electro-Coal's employees, and the union did not insist that its members actually do the work. The court also found that the statements by the union leaders about serious labor problems were a reference to possible wildcat activity by rank and file members and not veiled threats of concerted union activity.
 
 II
 
 9
 Two separate inquiries are required under section 8(b)(4)(ii)(B). The first relates to the Nature of the union's conduct: whether the union threatened, coerced or restrained any person within the meaning of the section. The second relates to the Purpose of the union's conduct: whether an object was to force any person to cease doing business with another. Carrier Air Conditioning Co. v. NLRB, 547 F.2d 1178, 1188 (2d Cir. 1976), Cert. denied sub nom. Sheet Metal Workers' International Association, Local 28 v. Carrier Air Conditioning Co., 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). Both requirements must be satisfied to make out a violation. It is permissible for a union to pressure an employer in a primary dispute even though neutral third parties are thereby affected. NLRB v. Local 825, International Union of Operating Engineers (Burns & Roe), 400 U.S. 297, 303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971); National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967). Conversely, a union may pursue secondary objectives through peaceful, non-coercive means such as informational picketing. See NLRB v. Fruit & Vegetable Packers, Local 760, 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964). We will deal with each requirement separately.
 
 A. Threats and Coercion
 
 10
 The district court found, by a preponderance of the evidence, that the statements attributed to the union officials did not rise to the level of threats of concerted union activity. We have reviewed the record carefully and find substantial support for the court's holding that statements by the union officials to the effect that there would be "problems" or "serious problems" if the contract violations continued referred only to the possibility of wildcat actions by the rank and file. Moreover, the National Labor Relations Board has often held that statements such as the ones made here are ambiguous and do not constitute threats unless accompanied by economic actions such as strikes or picketing that resolve the ambiguity. Compare, e. g., Carpenters District Council (Donn E. McKay), 211 N.L.R.B. 291 (1974), and Local 695, Laborers' International Union (Mautz & Oren, Inc.), 209 N.L.R.B. 410 (1974), With, e. g., United Brotherhood of Carpenters, Local 2067 (Associated General Contractors of America, Inc.), 166 N.L.R.B. 532 (1967), and International Brotherhood of Electrical Workers, Local 5 (Jonel Construction Co.), 164 N.L. R.B. 455 (1967). We hold the district court's finding not clearly erroneous.[4]
 
 
 11
 This does not end the inquiry, however. The district court failed to consider the coercive effect of the presentation of the contract grievance itself. In reliance upon a mutual interpretation of the contract, the unions gained from the employers, ADM and Cook, substantial payments for work not performed by union members work which the companies were already paying Electro-Coal to do. The employers thus paid double labor costs for the privilege of loading at Electro-Coal. We do not think any company would continue such an arrangement except for the most compelling business reasons. The reasons here are found in the employers' need to meet large grain export commitments. The demand for settlement payments was coercive within the meaning of section 8(b)(4)(ii)(B), and it was unlawfully coercive if undertaken to achieve a secondary objective. In this we agree with the Second and Ninth Circuits. See Carrier Air Conditioning Co. v. NLRB, 547 F.2d 1178, 1191 (2d Cir. 1976), Cert. denied sub nom. Sheet Metal Workers' International Association, Local 28 v. Carrier Air Conditioning Co., 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); Associated General Contractors, Inc. v. NLRB (Robert J. Ohland, Inc.), 514 F.2d 433, 438 (9th Cir. 1975). In the Ohland case, the court held that reliance upon a contractual arbitration procedure to impose a monetary assessment on the employer is economic pressure of a sufficiently "compelling or restraining nature" as to constitute prohibited coercion if done for an improper purpose. In Carrier Air Conditioning, the Second Circuit adopted the Ninth Circuit's reasoning and held unlawful the assessment of a contractually authorized fine against a general contractor for violation of a no-subcontracting clause. The only distinction between these cases and the one before us is that the ILA unions and NOSA were able to work out their differences without resort to the Agreement's arbitration procedure. This is a distinction without a difference. That the employers agreed with the unions on the interpretation of the contract and " voluntarily" made the payments does not mitigate one whit the influence the burden of making the payments would have on the employers' business decisions. If the unions intended to influence the employers for a secondary purpose, reliance on the contract violated section 8(b)(4)(ii)(B).
 
 
 12
 To be sure, the employers did not actually cease dealing with Electro-Coal until after the union indicated it would no longer accept a monetary settlement for contract violations. The substituted demand, however, that ILA labor be placed aboard the ships, also derived from the contract and was no less coercive under the circumstances than the demand for payment.[5] The unions were well aware that Electro-Coal would not permit union labor on vessels being loaded at its facility. The necessary consequence of the unions' demand was a cessation of dealing with Electro-Coal. The demand was thus coercive, notwithstanding its foundation in the contract,[6] and, if it was intended to effect the termination of the employers' use of Electro-Coal, it was unlawful coercion.
 
 B. The Unions' Objective
 
 13
 Although the unions' invocation of the work-preservation clauses of the contract was coercive, it was not an unfair labor practice unless the unions had a secondary objective. See NLRB v. Enterprise Association of Steam Pipefitters, Local 686, 429 U.S. 507, 510, 97 S.Ct. 891, 894, 51 L.Ed.2d 1 (1977) (Enterprise Association ); National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (National Woodwork ). Whether the unions' objective was primary or secondary turns on whether their activities were "addressed to the labor relations of the contracting employer Vis-a-vis his own employees," and therefore primary, or "tactically calculated to satisfy union objectives elsewhere," and thus unlawful secondary conduct. National Woodwork, 386 U.S. at 644-45, 87 S.Ct. at 1268, Quoted in Enterprise Association, 429 U.S. at 520, 97 S.Ct. at 899.
 
 
 14
 The district court erred in finding that because the actions of Locals 1418 and 1419 were directed solely to the enforcement of the Agreement those actions were necessarily primary. In Enterprise Association, a case which had not been decided when the district court's decision in this case was rendered, the Supreme Court reaffirmed its earlier holdings in National Woodwork and Local 1976, United Brotherhood of Carpenters v. NLRB (Sand Door),357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), that "a contract permitting or justifying the challenged union conduct is no defense to a § 8(b)(4) charge." Enterprise Association, 429 U.S. at 518, 97 S.Ct. at 898; Accord NLRB v. Carpenters District Council (Delta Painting Co.), 407 F.2d 804 (5th Cir. 1969). "There is thus no doubt that the collective-bargaining (agreement) is not itself a sufficient answer to a § 8(b)(4)(B) charge." Enterprise Association, 429 U.S. at 520, 97 S.Ct. at 899. We emphasize that work preservation clauses such as those relied upon here are not per se invalid. It is only when such provisions are sought to be applied with the intent of indirectly pressuring someone other than the immediate employer that they run afoul of the statute. Otherwise valid contract clauses cannot be invoked for such a purpose because section 8(b)(4)(B) protects the freedom of an employer to decide, at the time a concrete situation arises, whether to refuse to deal with another or to maintain normal business relations despite the other's labor policies. See Sand Door, 357 U.S. at 105-06, 78 S.Ct. at 1019 (construing predecessor to present statute), Quoted in Enterprise Association, 429 U.S. at 516, 97 S.Ct. at 897. Employer promises in a collective-bargaining agreement cannot control his choice. Id. at 517, 97 S.Ct. at 897.
 
 
 15
 We cannot determine, on the present state of the record, whether the unions' objective in this case was primary or secondary. The essential task for the court on remand will be to determine whether the unions sought to preserve for their members work traditionally done by them, National Woodwork,386 U.S. at 635, 87 S.Ct. at 1263, or impermissibly sought, by forcing the employers to stop dealing with Electro-Coal, to acquire work they had not previously performed, Enterprise Association, 429 U.S. at 528-29 n.16, 97 S.Ct. at 903-04; Humphrey v. International Longshoremen's Association, 548 F.2d 494 (4th Cir. 1977). An important predicate to that determination will be to define with some precision the traditional work of these union longshoremen, I. e., whether it is the loading of particular ships wherever they dock in a particular area, or the loading of all ships that dock at particular facilities. These are not necessarily the only possibilities. The court should examine all the surrounding circumstances, including the remoteness of the threat to the unions of job displacement by Electro-Coal, the history of relations between the unions and NOSA, and the "economic personality" of the industry. National Woodwork, 386 U.S. at 644 n.38, 87 S.Ct. at 1268.[7]
 
 
 16
 We express no opinion as to the proper outcome of the difficult inquiry necessary on remand, and nothing contained herein should be construed to the contrary. However, we think the unions' insistence throughout this proceeding, both in the court below and on appeal, that they never sought to displace Electro-Coal's employees or organize them in any way is hardly conclusive of the issue. There need be no actual dispute with the boycotted employer for the unions' activity to fall within the prohibition of section 8(b)(4)(ii)(B), National Woodwork, 386 U.S. at 645, 87 S.Ct. at 1268, and the secondary objective need not be the unions' sole purpose, Enterprise Association, 429 U.S. at 530 n.17, 97 S.Ct. at 904; NLRB v. Denver Building Council, 341 U.S. 675, 689, 71 S.Ct. 943, 951, 95 L.Ed. 1284 (1951). If Electro-Coal was a tactical object of the unions' activity, it has suffered a secondary boycott through pressure on the neutral NOSA employers. The contract provisions do not by themselves define the traditional work of the unions' members. The Agreement is evidence of the past relationship between the unions and NOSA, and the history of its provisions should be explored, but the district court's decision must encompass all the facts and circumstances.
 
 
 17
 In addition, once the court has defined the work involved, we see no reason why it may not consider whether Cook and ADM had control over the assignment of that work as part of the totality of circumstances in evaluating the unions' objectives. See Enterprise Association, 429 U.S. at 521-28, 97 S.Ct. at 900-03. Although Enterprise Association involved a product boycott, the principle that the employer's right of control over the work is a relevant circumstance is equally applicable in this type of case. See International Longshoremen's Association, Local 1575 v. NLRB (PRMMI), 560 F.2d 439, 445-47 (1st Cir. 1977).
 
 III
 
 18
 For the foregoing reasons, the judgment of the district court is VACATED and the cause REMANDED with instructions.
 
 
 
 [1]
 § 158 Unfair Labor Practices
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is
 (B) forcing or requiring any person . . . to cease doing business with any other person.
 
 
 [2]
 Cook is not itself a signatory to the Agreement, but its wholly-owned stevedoring subsidiary, St. John Shipping Company, is a signatory, and, under NOSA's bylaws, the parent is bound by all labor contracts entered into by its subsidiary
 
 
 [3]
 The Agreement extends from the mouth of the Mississippi River up to the Port of Baton Rouge
 
 
 [4]
 Plaintiff contends that Henry's statement that he might go to the Masters, Mates, and Pilots Association is of a different character and clearly a threat. In view of our disposition of this case, we express no opinion on the issue. Plaintiff may pursue the point on remand
 
 
 [5]
 Actually, this was a repetition of the demand made originally on Cook in January. At that time, as a result of the demand, Cook diverted a ship it had scheduled for loading at Electro-Coal
 
 
 [6]
 The employers and the unions agreed that the contract required that union labor be on the ships. We do not purport to interpret the contract
 ADM was not a party to and not bound by the Agreement. It participated in the settlement, however, because it was using a shipper bound by the Agreement who, not surprisingly, required ADM to pay the extra labor costs demanded by the unions. Record, vol. 2, at 85-86. In any case, the unions and ADM both regarded ADM's payment as settlement of the unions' grievance. Id. at 80. Although ADM was not bound directly by the contract, the Agreement was the source of the grievance, and ADM was coerced in the same way as the other employers by the burden of paying the settlement.
 
 
 [7]
 The advent of containerization has spawned several decisions concerning the traditional work of longshoremen. See, e. g., International Longshoremen's Assoc., Local 1575 v. NLRB (PRMMI), 560 F.2d 439 (1st Cir. 1977); International Longshoremen's Assoc. v. NLRB, (Twin Express), 537 F.2d 706 (2d Cir. 1976), Cert. denied sub nom. New York Shipping Assoc. v. NLRB, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); International Longshoremen's Assoc. (U. S. Naval Supply Center), 195 NLRB 273 (1972). We express no opinion as to the correctness of these cases; each turns on its own particular facts. We note them for whatever guidance they may provide the court on remand since we have found no case directly in point