INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, LOCAL 1575,
AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 76–1464.

United States Court of Appeals,
First Circuit.

June 30, 1977.

Nicholas Delgado-Figueroa, Santurce, P. R., for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., Washington, D. C., were on brief, for respondent.

Before VAN OOSTERHOUT,* INGRAHAM ** and CAMPBELL, Circuit Judges.

INGRAHAM, Circuit Judge.

The National Labor Relations Board found that International Longshoremen's Association (ILA), Local No. 1575, engaged in prohibited secondary boycott activity in violation of § 8(b)(4)(B) of the National Labor Relations Act.[1] Upon petition to review and set aside, countered by cross-application to enforce, we find the Board's order supported by substantial evidence and entitled to enforcement.

At the heart of this dispute is the application of technology to cargo shipping. Containerization was introduced into Puerto Rico in the mid-1950's. It has revolutionized the industry but has had deleterious effects upon the work opportunities available to longshoremen. Some shipments by a single consignor from the continental United States to Puerto Rico[2] will fill a cargo container (which may be as large as 8' × 8' × 40'). Other shipments will will not fill a container. The smaller shipments are known as "less than container loads," "less than trailer loads," or, in the parlance of the trade, "LTL's." LTL's are brought to a freight consolidator located off the dock. The freight consolidator, which may or may not be unionized, fills ("stuffs") a cargo container with LTL's from a number of consignors. The container is taken to the pier and longshoremen load it on to the ship. Upon its arrival in Puerto Rico, the container is unloaded by longshoremen from the vessel and taken to a marshalling yard on or near the pier. The local office of the freight consolidator transports the container to its facility, where it unpacks ("strips") the container and holds the LTL's for the various recipients. This process is more efficient than the time-honored method of hoisting small packages one by one into and out of the ship's hold. Predictably, containerization has reduced the man-hour

* Of the Eighth Circuit sitting by designation.

** Of the Fifth Circuit sitting by designation.

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
* * * * * *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

2. Shipments from Puerto Rico to the mainland are not at issue in this case.

requirements for freight handling. When employees of the freight consolidator are not organized by the ILA, the effect upon the employment of longshoremen is even more drastic.

Local 1575 is the certified representative of longshoremen in Puerto Rico. In 1968 the Local signed separate agreements with two steamship companies which used containers. The agreements included a provision requiring all containers arriving in Puerto Rico to be stripped by ILA members at the pier and restuffed before release to the freight consolidators. However, all shipments handled by freight consolidators then in existence were exempted from the requirement of stripping and restuffing. The assets of the steamship companies were subsequently acquired by the Puerto Rico Maritime Shipping Authority, which then contracted with Puerto Rico Marine Management, Inc. (PRMMI) and Maritime Transportation Management, Inc. (MTM) to operate the services formerly supplied by the private steamship company. Subsequent agreements between the ILA and PRMMI and MTM included the containerization provision.

San Juan Freight Forwarders (San Juan), International Container Express (International) and Sea Freight Express (Sea Freight) were among the freight consolidators which came into existence after the 1968 agreements. They were not protected by the grandfather clause in those agreements. However, the union did not insist upon enforcement of the containerization provision until early 1975. Until then, San Juan, which had been in existence since 1972, received containers from PRMMI without prior stripping and restuffing by ILA labor.

On February 23, 1975, union representative Ramon Moncao informed Antonio Feliciano, a PRMMI superintendent, that the union would prevent release by PRMMI of containers destined for San Juan Freight Forwarders unless they were stripped and restuffed by ILA members at the dockside warehouse. Feliciano called Guillermo Ortiz, Sr., the president of the local, to protest that the general practice had been to exempt San Juan from the requirement. Ortiz stressed the union's opposition to release of the containers without stripping and restuffing. He warned that noncompliance would result in a strike. PRMMI stalled. It held the containers but did not permit longshoremen to strip them. Ortiz then let it be known that the issue might also be resolved if San Juan came to the ILA shapeup and hired longshoremen to go to the facility and strip the containers.

On March 11, 1975, the United States District Court in Puerto Rico ordered PRMMI to release twenty containers belonging to San Juan. When Feliciano called Ortiz to notify him of the order, Ortiz replied, "Well, I'm not a part of that order so I don't have to comply. . . . [I]f you deliver those containers there is going to be a general strike because that's a violation of the contract." The next day PRMMI and the union exchanged letters in a temporary compromise which allowed the containers to be released. However, San Juan containers continued to arrive on PRMMI ships. On March 21, 1975, the district court ordered PRMMI to release an additional twenty-one containers destined for San Juan Freight Forwarders. PRMMI did not immediately comply because Ortiz reiterated that a strike would follow. On March 25th, after a hearing in the district court, a stipulation was entered into by San Juan, PRMMI and the union. The vans were delivered. However, yet another court order was required on April 21st for thirty-seven more containers. A San Juan employee picked up one of the containers that afternoon. As soon as he had left, the ILA struck PRMMI and blocked the entrances to the marshalling yards, thus preventing pickup of the remaining thirty-six containers. The work stoppage ended about an hour later when PRMMI agreed to halt further delivery of the vans. On April 24th the containers were finally released. In mid-June another exchange of letters between PRMMI and the union resulted in the release of fourteen containers to San

Juan. A § 10(*l*)[3] injunction was issued under which San Juan resumed normal business relations with PRMMI.

MTM also received communications from the union designed to prevent delivery of containers belonging to non-exempt freight consolidators. Miguel Rossy, then the MTM controller, was first contacted in late February 1975 by the union representative Moncao abut the dispatch of LTL containers to San Juan. For a couple of months Rossy had conversations with Moncao, Guillermo Ortiz, Jr., the vice-president of the local, and Ortiz, Sr. The elder Ortiz instructed MTM not to deliver containers to San Juan, Sea Freight or International unless MTM was prepared to suffer a complete stoppage of operations.

During this time Ortiz, Jr. was contacted by a local businessman whose goods were detained at PRMMI because of the wrangle. Ortiz *fils* told him. "Listen, there are no problems here at all except that these people—San Juan Freight—they want to handle the vans, take them to their plant and they have personnel who earn much less money than our people which means that they are hurt . . . . All we want is (for San Juan) to authorize us, we will take the vans over to their place and strip them and no sweat."

San Juan, PRMMI and MTM each filed charges with the NLRB. These were consolidated into a single complaint. After notice and hearing, the administrative law judge found:

> [T]he Union's objective was to secure for its own members the work of stripping and stuffing LTL vans consigned to San Juan Freight. [T]his was not work traditionally performed by ILA members but rather had always been performed by San Juan Freight with its own employees . . . far removed from dock-side where ILA members engaged in their traditional work of loading and unloading ships.

The administrative law judge also found that the union's threats against PRMMI

and MTM and its actual stoppage of PRMMI operations were designed to force the companies to stop doing business with San Juan, Sea Freight and International. This was deemed to be an illegal secondary boycott. The administrative law judge ordered the union to cease and desist from this activity. He ordered it to take affirmative action by posting notices in English and Spanish in its offices. The local was also ordered to sign notices for posting at the Puerto Rico offices of PRMMI, MTM, San Juan, Sea Freight and International. Upon exceptions by the union, a panel of the Board affirmed the findings and conclusion of the administrative law judge and adopted his order. This petition and cross-application followed.

■ The secondary boycott was outlawed by Congress in order to prevent unions from injuring third parties who were neutrals in disputes between unions and employers. Congress has determined that it is repugnant to allow a union to deliberately harm a neutral in order to obtain concessions from the real party to the dispute. *See National Woodwork Manufacturers Ass'n. v. N. L. R. B.*, 386 U.S. 612, 623–33, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). In addition, the secondary boycott upsets the balance which Congress has sought to introduce at the bargaining table. It decreases the target's business and leaves it less able to resist union demands. Note, Secondary Boycotts and Work Preservation, 57 Va.L. Rev. 1280, 1289 (1971).

In this case the Board found that the union exerted pressure against the neutrals, PRMMI and MTM, in order to force changes in the operation of San Juan, International and Sea Freight. Under *National Woodwork Manufacturers v. N. L. R. B., supra*, the union's defense was that it sought to preserve work traditionally done by its members. Although the administrative law judge cited no cases, his Decision and Order appear to be based upon *National Woodwork*. In the interim, another circuit has decided a case strikingly similar to

---

**3.** 29 U.S.C. § 160(*l*). This section allows the Board to seek injunctions pending Board adjudication of conduct alleged to violate paragraph (4)(A), (B) or (C) of § 8(b).

this one. *International Longshoremen's Ass'n. v. N. L. R. B.*, 537 F.2d 706 (2d Cir. 1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 [1977]. And, just six days after oral argument in our case, the Supreme Court further illuminated the contours of the secondary boycott. *N. L. R. B. v. Enterprise Ass'n. of Steam, Hot Water, etc. Pipefitters*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 [1977]. This trio of cases provides the framework for our discussion.

## NATIONAL WOODWORK AND WORK PRESERVATION

■ *National Woodwork Manufacturers v. N. L. R. B.* involved a boycotted product. Frouge Corporation, a general contractor, employed union carpenters on a housing project in Philadelphia. The company and the union agreed to be bound by a local collective bargaining agreement. Rule 17 of that agreement prohibited the use of prefitted doors on construction projects. Frouge was therefore bound to use "blank" doors, which required more on-site work by the carpenters. Although adherence to the contract was possible, Frouge disregarded Rule 17 and ordered 3,600 prefitted doors from a member of the National Woodwork Manufacturers Association. Union officials ordered the rank and file not to hang the prefitted doors. Frouge capitulated and the carpenters completed the project with blank doors. The woodwork association charged that the union stoppage violated § 8(b)(4)(B) and that the contract violated § 8(e).[4] The Court held that neither provision had been violated. Secondary boycott theory is grounded in the desire to protect neutrals from union coercion and retaliation. Of course, every strike has ripple effects. However, if § 8(b)(4)(B) were intended to prohibit all strikes which harm outside parties, then virtually all strikes would be prohibited. *Local 761, International Union of Electrical Workers v. N. L. R. B.*, 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Rather, § 8(b)(4)(B)

4. 29 U.S.C. § 158(e).

Section 8(e), the "hot cargo" provision, complements but does not parallel § 8(b)(4)(B). *NLRB v. Enterprise Ass'n. of Steam, Hot*

was designed to insure that such ripple effects were no more than the unavoidable result of "primary conduct." *National Woodwork, supra*, 386 U.S. at 627, 87 S.Ct. 1250. The Court held that the primary target of the stoppage was Frouge, not the neutral manufacturer of prefitted doors. Therefore, no secondary boycott had occurred. In surveying a boundary between primary and secondary activity, Justice Brennan admitted the difficulty of precision. He defined the appropriate standard for determining whether conduct was primary or secondary as follows:

The determination whether the "will not handle" sentence of Rule 17 and its enforcement violated § 8(e) and § 8(b)(4)(B) cannot be made without an inquiry into whether, under all the surrounding circumstances,[38] the Union's ob-

[38] As a general proposition, such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry. See Comment, 62 Mich.L.Rev. 1176, 1185, *et seq.* (1964).

jective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere . . . . There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees. This will not always be a simple test to apply . . . . The finding of the Trial Examiner, adopted by the Board, was that the objective of [Rule 17] was preservation of work traditionally performed by

*Water, etc. Pipefitters, supra*, 429 U.S. at 507, 97 S.Ct. 891. No § 8(e) charge was filed in our case.

the jobsite carpenters. This finding is supported by substantial evidence and therefore the Union's making of the "will not handle" agreement was not a violation of § 8(e).

Similarly, the Union's maintenance of the provision was not a violation of § 8(b)(4)(B). The Union refused to hang prefabricated doors whether or not they bore a union label, and even refused to install prefabricated doors manufactured off the jobsite by members of the Union. This and other substantial evidence supported the finding that the conduct of the Union on the Frouge jobsite related solely to preservation of the traditional tasks of the jobsite carpenters.

386 U.S. at 644–46, 87 S.Ct. at 1268.

However, *National Woodwork* left some problems unresolved. In distinguishing *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), which held certain agreements to violate the anti-trust laws, the Court noted that:

> * * * [T]he fact is that the boycott in *Allen Bradley* was carried on, not as a shield to preserve the jobs of Local 3 members, traditionally a primary labor activity, but as a sword, to reach out and monopolize all the manufacturing job tasks for Local 3 members. It is arguable that Congress may have viewed the use of the boycott as a sword as different from labor's traditional concerns with wages, hours, and working conditions. But the boycott in the present cases was not used as a sword; it was a shield carried solely to preserve the members' jobs. We therefore have no occasion today to decide the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened by the boycotted product.

386 U.S. at 630–31, 87 S.Ct. at 1261. Justice Harlan, concurring in the opinion to create a five justice majority, added a Memorandum further outlining his views. He stated:

> 1. The facts as found by the Board and the Court of Appeals show that the contractual restrictive-product rule in question, and the boycott in support of its enforcement, had as their sole objective the protection of union members from a diminution of work flowing from changes in technology. Union members traditionally had performed the task of fitting doors on the jobsite, and there is no evidence of any motive for this contract provision and its companion boycott other than the preservation of that work. This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses, for the purpose of acquiring for its members work that had not previously been theirs.
>
> 2. The only question thus to be decided, and which is decided, is whether Congress meant, in enacting §§ 8(b)(4)(B) and 8(e) of the National Labor Relations Act, to prevent this kind of labor-management arrangement designed to forestall possible adverse effects upon workers arising from changing technology.

386 U.S. at 648, 87 S.Ct. at 1270.

*National Woodwork* prompted commentators to focus upon work preservation as a defense to secondary boycott and hot cargo charges. See Note, Work Recapture Agreements and Secondary Boycotts, 90 Harv.L. Rev. 815 (1977); Note, A Rational Approach to Secondary Boycotts and Work Preservation, 57 Va.L.Rev. 1280 (1971); Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401 (1968). Speculation arose as to the precise delineation between work preservation and work acquisition, especially in cases where unions sought to reacquire jobs which had changed due to technological advancement and which were then performed by others. The dispute before us is a textbook example of a situation falling in no man's land. On the one hand, it can be argued that ILA goals extend beyond work preservation: (1) longshoremen are now seeking to disassemble packages coming out of the ship, and (2) they seek to perform work many miles from their traditional site at the docks. But from the standpoint of

the union, the stoppage was aimed at preserving the longshoremen's traditional role—handling small packages which, before the advent of containers, were hoisted individually into and out of the ship.

Recently a Second Circuit panel decided a case similar to ours against the union and in favor of the Board. The facts are essentially the same, involving the ILA, various freight consolidators, and the New York Shipping Authority. District Judge Wyzanski of this Circuit, sitting by designation, joined by Circuit Judge Moore, adopted the Board's language in that case:

[I]n order to properly evaluate the validity of ILA's claim to the work "it is essential to define with some precision the work in controversy since that is the predicate upon which the issue of work preservation must turn." It is clear from the record that the work in controversy here is the LCL and LTL container work performed by Consolidated and Twin at their own off-pier premises. It is with this precise work in mind that the contentions of the parties must be evaluated.

The traditional work of the longshoremen represented by ILA has been to load and unload ships. When necessary to perform their loading and unloading work, longshoremen have been required to stuff and strip containers on the piers. [Footnote omitted.]

Similarly, for many years, maritime cargo has been sorted and consolidated off the docks by companies employing teamsters and unrepresented employees.

. . .

From the foregoing and the record as a whole, it is clear that the on-pier stripping and stuffing work performed by longshoremen as an incident of loading and unloading ships does not embrace the work traditionally performed by Consolidated and Twin at their own off-pier premises. It does not fall within ILA's traditional role to engage in make-work measures by insisting upon stripping and stuffing cargo merely because that cargo was originally containerized by nonunit personnel. Yet, ILA's demand here could

only be met if the work traditionally performed off the pier by employees outside the longshoremen unit were taken over and performed at the pier by longshoremen represented by ILA.

*International Longshoremen's Ass'n. v. N.L. R.B.*, 537 F.2d 706, 711–12 (2nd Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 [1977].

Judge Feinberg dissented, contending that the Board had committed an error of law by focusing on the work done by the off-pier consolidators rather than the work formerly done by the longshoremen. He felt that the majority decision improperly downgraded the bargaining table as the ideal location for resolution of conflicts arising from technological change. 537 F.2d at 712–14. The Second Circuit majority accepted the Board's narrow definition of "work in question;" the Board defined the work by geographical location, type of company doing the work, and type of package loaded. That approach does have the advantage of protecting the off-pier consolidators and their employees from displacement. Note, Work Recapture Agreements and Secondary Boycotts, 90 Harv.L.Rev. 815, 827 (1977).

The fact situation we face presents a slightly stronger case for enforcement under *National Woodwork* than did the situation considered by the Second Circuit. Ortiz, Sr. suggested to PRMMI that San Juan hire ILA members. Ortiz, Jr., vice-president of the Local, told a business man that the union desired to strip the vans at San Juan's facility, displacing the non-union San Juan employees. The Board could easily conclude that the Local was seeking not merely to preserve work, but also to organize San Juan Freight Forwarders. See 90 Harv.L.Rev. at 820 n.30. Admittedly, the same union members who would have taken over at San Juan were threatened by containerization. To that extent work preservation is a factor in this case, but it cannot be said that there was a "complete absence of any union interest in the labor relations of (the) excluded employer," in this case San Juan. Note, A Rational Approach to

Secondary Boycotts and Work Preservation, 57 Va.L.Rev. 1280, 1300–01 (1971). In *National Woodwork* there was no interest in the labor relations of the manufacturer of the prefitted doors. Even union-constructed prefitted doors were rejected by the carpenters.

## PIPEFITTERS AND NLRB DISCRETION

A strong case thus exists under *National Woodwork* and the Second Circuit's above decision for enforcing the Board's order, especially in light of the statements by Ortiz, Sr. and Ortiz, Jr. and the traditional deference accorded the Board. *Bayside Enterprises, Inc. v. N.L.R.B.*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 [1977]; *N.L.R.B. v. Boeing Co.*, 412 U.S. 67, 75, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973).

However, the Supreme Court has very recently spoken in the subject once more, in *N.L.R.B. v. Enterprise Ass'n of Steam, Hot Water, etc. Pipefitters.* This case seems to us to remove any lingering doubts as to the enforceability of the Board's present order. In *Pipefitters*, Austin Co., the general contractor for a home for the aged (Norwegian Home) subcontracted the climate control work to Hudik-Ross (Hudik). Hudik employed steamfitters belonging to the union. The collective bargaining agreement between them provided that pipe threading and cutting were to be performed at the jobsite. The steamfitters had traditionally done that work at the jobsite. Nevertheless, Hudik then agreed to a provision in its subcontract with Austin that contemplated the purchase of units manufactured by Slant/Fin Corp. whose product had pipes which were cut, threaded and installed at the Slant/Fin factory. When these units arrived at the site, the steamfitters refused to install them. The entire project was delayed. Austin filed an unfair labor practice complaint with the Board, charging that the union sought (1) to force Hudik to cease doing business with Austin and (2) to coerce Hudik and Austin to cease doing business with Slant/Fin.

■ Were work preservation the deciding issue in the case it would seem that *National Woodwork* presented the union with a defense to the § 8(b)(4)(B) charge. As in *National Woodwork*, the union's concern was not with Slant/Fin employees; the union sought only to perform work traditionally done by its members and specifically agreed to by the employer Hudik. However, the Board for a number of years has had a "right to control" test which is a factor in the determination of primary or secondary conduct. *See, e. g., Local Union No. 438, United Association of Journeymen and Apprentices (George Koch Sons, Inc.)*, 201 N.L.R.B. 59, *enforced*, 490 F.2d 323 (4th Cir. 1973). Under that test, if the struck employer (in this case, Hudik) cannot "control" the work sought by the union, then the union's actions are considered to be directed beyond the employer, and therefore secondary. The administrative law judge found that union pressure on Hudik alone could not secure jobsite work for the steamfitters. Austin, the general contractor, was responsible for obtaining climate control units. The administrative law judge concluded that the union of necessity sought to influence Austin by pressuring Hudik. In other words, he found, and the Board agreed, that Hudik was a neutral caught in a crossfire between the union and Slant/Fin and Austin. The Court of Appeals for the District of Columbia Circuit, sitting en banc, refused to enforce the Board's order. It held that an employer who is struck by his employees to enforce a lawful provision in a collective bargaining agreement can never be considered a neutral bystander in the dispute. 172 U.S.App.D.C. 225, 521 F.2d 885, 903. The court of appeals also rejected the use of the "right to control" test as an impermissible expansion of § 8(b)(4)(B). 521 F.2d at 894. The Supreme Court reversed, accepting the finding of the Board that "under all the surrounding circumstances" Hudik was "only a means or instrumentality for exerting pressure against Slant/Fin and Austin with whom the Union has its primary dispute." 429 U.S. 507 at 523, 97 S.Ct. 891, 901, 51 L.Ed.2d 1, quoting 204 N.L.R.B. 760, 764. The Court upheld the "right to control" test.

[T]he Board may assign to the presence or absence of control much more weight than would the Court of Appeals, but this far from demonstrates a departure from the totality-of-the-circumstances test recognized in *National Woodwork*.

429 U.S. at 524, 97 S.Ct. at 901.

The Court agreed with the Board that pressure on Hudik would not suffice to secure the union's objectives because Hudik had no control over the decision to order climate control units. Justice White noted for the majority:

It is uncontrovertible that the work at this site could not be secured by pressure on Hudik alone and that the union's work objectives could not be obtained without exerting pressure on Austin as well.

429 U.S. at 529, 97 S.Ct. at 904. Apparently the majority was unmoved by the finding of the court of appeals that Hudik could have compromised the dispute. 521 F.2d at 899 and n.34. Justice Brennan observed in dissent that the Board had found the union's goal was work preservation. If the union sought to preserve work, "it presumably would be willing to negotiate some substitute for full compliance, such as premium pay, to replace the lost work. Nothing . . . indicates that Hudik made any attempt to reach that or any other compromise solution." 429 U.S. at 538, 97 S.Ct. at 909.

However, it is unclear whether the union's aim was mere work preservation. The Board had found that the goal was work preservation. 204 N.L.R.B. at 760. But the Court, having held that mere work preservation would not immunize the union, stated:

Here, . . . the union . . . sought to acquire work that it never had and that its employer had no power to give it, namely, the piping work on units specified by any contractor or developer who prefers and uses prepiped units. By seeking the work at the Norwegian Home, the union's tactical objects necessarily included influencing Austin; this conduct falls squarely within the statement of *National Woodwork* that a union's activity is secondary if its tactical object is to influence the boycotted employer.

429 U.S. at 538 n.16, 97 S.Ct. at 904.

■ The following conclusions can be drawn from *Pipefitters*. First, the goal of work preservation does not necessarily insulate a union from the finding that it engaged in a secondary boycott. Second, even if work preservation is a defense, the range of work which can be preserved has narrowed significantly, since the Supreme Court viewed the work in question as "the piping work on units specified by any contractor or developer ·who prefers and uses prepiped units." 429 U.S. at 528 n.16, 97 S.Ct. at 904. Third, under the totality of the circumstances test, the Board has discretion to determine which circumstances it deems important. As a corollary, the Board may define "right to control" narrowly. The fact that a subcontractor might satisfy the strikers in some other way, such as higher pay, does not necessarily defeat the claim that the subcontractor has no right to control the work.

■ Applied to the case before us, *Pipefitters* mandates the finding of an unfair labor practice. Mere work preservation would not immunize the union. The Board's definition of the work in question as the stripping and stuffing of vans consigned to freight consolidators is supported by substantial evidence and within its discretion. Once we accept this definition, we readily agree that the work in question was not traditionally done by the longshoremen. If right to control the work is relevant to this case, the fact that PRMMI and MTM might have paid higher wages to the longshoremen in compromise of the dispute does not transform the union pressure into primary activity. The union sought the work, not other benefits. And even though PRMMI and MTM might have had the power to refuse to accept containers unless stripped by longshoremen, this does not require that the activity be deemed primary. The importance of *Pipefitters* is not that it enshrines "right to control" as the correct test, but that it allows the Board to determine how important right to control is under the totality of the circumstances. 429 U.S. at 507, 97 S.Ct. 891.

*APPROPRIATE RELIEF*

██ The Local contends that the Board's order improperly required the posting of notices at the offices of Sea Freight and International. With substantial evidence to support its finding of an unfair labor practice, the Board was also entitled to exercise its discretion in shaping a remedy. *May Department Stores v. N.L.R.B.*, 326 U.S. 376, 392, 66 S.Ct. 203, 90 L.Ed. 145 (1945). Ortiz, Sr. told MTM that deliveries to San Juan, Sea Freight or International would result in a work stoppage. The order involved no parties which were unaffected by the secondary boycott; it lies within the parameters of the proper exercise of discretion. *N.L.R.B. v. Springfield Bldg. & Construction Trades Council*, 262 F.2d 494, 498–99 (1st Cir. 1959). See also *Communications Workers of America v. N.L.R.B.*, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960) (*per curiam*); *Highway Truck Drivers and Helpers Local 107 v. N.L.R.B.*, 107 U.S.App. D.C. 1, 273 F.2d 815 (1959). The order is entitled to enforcement.

ENFORCEMENT GRANTED.