LOCAL UNION NO. 25, A/W INTERNA-
TIONAL BROTHERHOOD OF TEAM-
STERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS OF
AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Boston Deliveries, Inc., Intervenor.

No. 87–1173.

United States Court of Appeals,
First Circuit.

Argued Sept. 16, 1987.

Decided Oct. 27, 1987.

Gabriel O. Dumont, Jr., with whom Gra-
dy, Dumont & Dwyer, Boston, Mass., was
on brief, for petitioner.

David A. Fleischer, with whom Rose-
mary M. Collyer, General Counsel, John E.
Higgins, Jr., Deputy General Counsel, Rob-
ert E. Allen, Associate General Counsel,
and Elliott Moore, Deputy Associate Gener-
al Counsel, Washington, D.C., were on
brief, for respondent.

Robert N. House with whom Allport,
Knowles, Miller & House, Cleveland, Ohio,
was on brief for, intervenor.

Before BREYER and SELYA, Circuit
Judges, and LAGUEUX,* District
Judge.

SELYA, Circuit Judge.

Petitioner-appellant Local Union No. 25,
an affiliate of the International Brother-
hood of Teamsters, seeks to set aside cer-
tain findings of the National Labor Rela-
tions Board and to escape from the remedi-
ation imposed in consequence of those find-
ings. The NLRB—which determined that
the union had engaged in unfair labor prac-
tices in violation of §§ 8(b)(4)(i) and
8(b)(4)(ii)(B) of the National Labor Rela-
tions Act (Act), 29 U.S.C. §§ 158(b)(4)(i),

---

* Of the District of Rhode Island, sitting by desig-    nation.

(ii)(B) (1982), *see Local Union No. 25 (Boston Deliveries, Inc.),* 282 N.L.R.B. No. 138 (Jan. 30, 1987)—has cross-applied for enforcement of its remedial order. We have jurisdiction under §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e), (f) (1982). Having scrutinized the record and the parties' arguments with care, we reject Local 25's petition and enforce the Board's command.

## I. LOADING UP

For many years, Boston Deliveries, Inc. (Bodeli), an intervenor herein, has been engaged in the business of providing transportation and freight handling services in the vicinity of Boston, Massachusetts. Sears, Roebuck & Co. (Sears) was Bodeli's sole customer. In addition to furnishing drivers to Sears, Bodeli also obligated itself contractually to supply "platform men and helpers," *i.e.,* dock workers, "if requested by Sears." The agreement bound Bodeli to provide the described services, including dock work, "in accordance with [Sears'] requests." That portion of Bodeli's work force which toiled in Sears' vineyards was covered by a collective bargaining agreement between Bodeli and Local 25. The latest installment of this pact ran from April 1985 through March 1988, and was in full force and effect at all times material hereto.

Despite the fact that the freight handling contract was terminable by either party at will (on thirty days written notice), Bodeli and Sears worked hand in glove under it for over fifteen years. In November 1984, however, Sears inaugurated a new warehouse operation. It began to reserve dock work for its own staff. The following spring, six of Bodeli's employees were laid off and thereafter prosecuted grievances pursuant to the collective bargaining agreement. The sextet, claiming to have been sidelined while Sears' employees took over the platform work, sought backpay and an order requiring Bodeli to refrain from its supposed violations of the union contract. The matter was arbitrated in the predetermined manner by reference to a regional panel—NEJAC—comprised of representatives of some sixteen Teamsters' locals and an equal number of management designees. NEJAC held a hearing on July 17, 1985. Bodeli took the position that Sears had decided to use its own personnel for platform work, that Sears was entitled to do so, and that Bodeli was powerless to deter its customer. Nevertheless, NEJAC sustained the grievances.

On June 28, while the initial grievances were hanging fire, Sears sent formal written notice that it no longer needed Bodeli to perform *any* loading or unloading services, and that it was cancelling the contract for those services as at August 1, 1985. Bodeli informed its crew of this development. The NEJAC decision resolving the half-dozen original grievances intervened at this point, and Bodeli did not immediately respond to it. On the August 1 changeover date, however, the pot began to boil. The union struck and commenced picketing, albeit briefly. Bodeli then paid the six May/June grievants under protest, and sued in federal district court to vacate the arbitral award. Local 25 counterclaimed to enforce the award. That suit remains pending.

Subsequent to August 1, 1985, the union presented and processed a host of additional grievances, averring in substance that Sears' takeover of the platform work, and Bodeli's acquiescence in that maneuver, had caused further losses to affected union members and comprised a breach of the collective bargaining pact. NEJAC deadlocked on these remonstrances, and further arbitral proceedings have thus far proven inconclusive. On September 4, 1985, the intervenor, *qua* charging party, filed a complaint with the NLRB. And that fall, the union presented and processed eighteen additional grievances.

## II. BOARDING UP THE LOAD

We pause at the foot of the ramp leading to our recital of the proceedings before the Board in order to remark upon some familiar topography:

[T]he NLRB's findings of fact are conclusive if bottomed upon substantial evidence in the record considered as a whole. Provided the findings are so sup-

ported, the courts ought not disturb the Board's choice between competing views, or its credibility determinations. After all is said and done, conflicts and contradictions in the evidence, within the broadest of parameters, are for the Board to resolve.

*Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 612 (1st Cir.1987) (citations omitted).

A hearing on Bodeli's charge was held before an administrative law judge (ALJ). Following the hearing, the ALJ found, among other things, that: (1) Sears, not Bodeli, made the decision to shift the burden of the platform work; (2) Bodeli had not the slightest control over that decision; (3) the union's real dissatisfaction was with Sears, not Bodeli; (4) Local 25 utilized proscribed tactics, including the strike, in an attempt to force a neutral employer (Bodeli) to press Sears to restore the work; and (5) the union's course of conduct constituted an unfair labor practice. The ALJ recommended extensive remediation, to include that Local 25, its officers, agents, and representatives, cease and desist from:

> (a) Registering, filing or processing grievances against Boston Deliveries, Inc., demanding compliance by Boston Deliveries, Inc. with awards obtained as a result of such grievances, or striking or picketing Boston Deliveries, Inc., where an object thereof is to force or require Boston Deliveries, Inc. to cease doing business with Sears, Roebuck & Co. or any other person.

> (b) In any other manner or by any other means, engaging in or inducing or encouraging any individual employed by Boston Deliveries, Inc. or by any other person engaged in commerce or in an

industry affecting commerce, to engage in, a strike or a refusal in the course of his employment to transport or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, or threatening, coercing or restraining Boston Deliveries, Inc. or any other person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require Boston Deliveries, Inc. to cease doing business with Sears, Roebuck & Co. or any other person.

The ALJ also ordered that various affirmative steps be undertaken, such as the withdrawal of all pending grievances which purported to challenge Sears' assignment of platform work in-house; discontinuance of the union's counterclaim in the federal district court action; and reimbursement of the payments which had been made to the six original grievants under the NEJAC award.

The Board, for the most part, affirmed and adopted the ALJ's findings, conclusions, rulings, and remedial order. *See Local Union No. 25* (Boston Deliveries, Inc.), 282 N.L.R.B. No. 138 (Jan. 30, 1987).[1] There was, however, one point of departure. Although the Board agreed that the union's "entire course of conduct" amounted to perpetration of an unfair labor practice, it found no need "to pass on whether the [union's] filing and processing of grievances alone constitutes unlawful secondary activity." *Id.* at n. 1. These proceedings ensued.

## III. UNLOADING THE GOODS

Section 8(b)(4)(i, ii)(B) of the Act, set out in material part in the margin,[2] casts a

---

**1.** In view of this affirmance by adoption, we shall henceforth refer to the ALJ's findings as the Board's. *See NLRB v. Horizon Air Services, Inc.,* 761 F.2d 22, 24 n. 1 (1st Cir.1985).

**2.** The statutory language reads as follows:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
>     \*    \*    \*    \*    \*    \*
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a

refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

>     \*    \*    \*    \*    \*    \*
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to

rather large shadow over this litigation. The Board's application of the statutory principles to the case at bar was, the appellant importunes us, erroneous in two respects: first, the Board's conclusion that the union engaged in unlawful "secondary" activity was flawed by an improper focus on the right to control the disputed platform work; and second, because the activities of Local 25 "involved only the processing and enforcement of grievances" under a collective bargaining agreement, Appellant's Brief at 17, the finding of violation was an unsupportable one. We assay these contentions separately.

## A. *The Right to Control.*

Section 8(b)(4)(i, ii)(B) represents a legislative effort to accommodate twin lines of thought, lines which can easily snarl and tangle if not held straight and true. A union has a right to press a recalcitrant employer within the limits of the law; but, management has an equal and correlative right to be protected from becoming a union pawn in an end game directed at some other employer. Thus, in enacting § 8(b)(4)(i, ii)(B), Congress sought both to "preserv[e] the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and [to] shield[ ] unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building and Construction Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). Whether a labor union's behavior is unlawful depends on its object: is the pressure applied to force a change in the labor policies of the directly affected (*i.e.*, "primary") employer or of some other, more remote (*i.e.*, "secondary") employer? *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 632, 87 S.Ct. 1250, 1262, 18 L.Ed.2d 357 (1976). If the former, and if the means chosen are not themselves unlawful, the conduct is permissible. If the latter, the conduct is proscribed—"secondary"—even if the union members who stand to gain are on the payroll of the

coerced concern. *Id.* at 644–45, 87 S.Ct. at 1268.

In this case, the Board found that Local 25's armtwisting was secondary because it was aimed at and in furtherance of the union's dispute *with Sears*—notwithstanding that Bodeli's arm alone was being bent. To be sure, the union's bottom line was the effort to salvage the platform work for its members. But, a broad goal of work preservation—laudable though that may be—does not save a labor organization harmless from the charge. If union pressure was brought to bear on the wrong entity, liability may attach notwithstanding the work preservation rationale. *See International Longshoremen's Ass'n, Local 1575 v. NLRB*, 560 F.2d 439, 447 (1st Cir.1977). In short, the end does not justify every means.

█ The Board found that Sears—not Bodeli—was the primary employer and that the union's coercion, directed at a secondary employer, was therefore inappropriate. In order to enlist Bodeli's assistance in persuading Sears to reverse the decision to use self-help on the loading dock, the union turned its guns on Bodeli. In the circumstances of this case, that was forbidden conduct. *See NLRB v. Local 825, International Union of Operating Engineers*, 400 U.S. 297, 305, 91 S.Ct. 402, 407, 27 L.Ed.2d 398 (1971). The record is replete with evidence—much of it uncontradicted—that Sears was the only game which was in season. Sears had absolute authority over the dock work. It was, in every meaningful sense, the ultimate arbiter of the job site. Sears agreed to subcontract to Bodeli only such chores as it chose. It was Sears which created the opportunity for platform work in the first place, Sears which destroyed that opportunity in the summer of 1985, and only Sears which could restore the lost jobs to the Teamsters. Without serious question, Sears and Sears alone possessed and exercised the right to control the work. Accordingly, Sears was the only allowable target of the union's quest.

cease doing business with any other person ... *Provided,* That nothing contained in this clause (B) shall be construed to make unlaw-

ful, where not otherwise unlawful, any primary strike or primary picketing....

29 U.S.C. § 158(b)(4)(i, ii)(B) (1982).

The Court has held flatly that § 8(b)(4)(i, ii)(B) will support a finding of an unfair labor practice "where the union employs a product boycott to claim work that the immediate employer is not in a position to award...." *NLRB v. Enterprise Ass'n of Steam, Hot Water, etc. Pipefitters,* 429 U.S. 507, 525–26, 97 S.Ct. 891, 902, 51 L.Ed.2d 1 (1977). Such coercion does not become lawful merely because it is designed to benefit the employees of the (improperly) coerced concern, *id.* at 529 n. 16, 97 S.Ct. at 903 n. 16, or because the coerced employer might be able to buy its way out of the dispute by paying higher wages to the affected union members. *International Longshoremen's Ass'n,* 560 F.2d at 447. It is not necessary that the only object of the guild's actions be a secondary one; so long as *an* object is to pressure a neutral employer, the violation is complete. *Denver Building and Construction Trades Council,* 341 U.S. at 689, 71 S.Ct. at 951. These precedents appear to govern this case.

Appellant's rejoinder, essentially, is that under *National Woodwork,* 386 U.S. at 644–45 & n. 38, 87 S.Ct. at 1268 & n. 38, the Board was required to consider more than the right to control the work, and failed to do so. We find this position untenable. We have held before that, "under the totality of the circumstances test, the Board has discretion to determine which circumstances it deems important." *International Longshoremen's Ass'n,* 560 F.2d at 447. Put another way, it is for the Board "to determine how important right to control is under the totality of the circumstances." *Id.* In this case, all of the pertinent facts were fully developed at the hearing. Those facts showed that Sears enjoyed a dominant position in its dealings with Bodeli. There was not the slightest basis for concluding that the intervenor had the right to assign the work and "intentionally forfeited" that right. *See George Koch Sons,*

*Inc. v. NLRB,* 490 F.2d 323, 328 (4th Cir. 1973). Here, as in *Koch,* there was no "intimation or trace of connivance or ... complicity...." *Id.* In the context of this case, the Board was amply warranted in concluding that the right to control the work was the overarching factor, and that the union, after it became aware of the dynamics of the situation,[3] nevertheless twisted the wrong arm, applying proscribed pressure on a neutral employer (Bodeli) in order to attempt impermissibly to influence the policies and practices of the primary employer (Sears).

### B. Threats; Coercion; Restraint.

■ Section 8(b)(4)(i) of the Act, 29 U.S.C. § 158(b)(4)(i), prohibits unions from engaging in strikes or withholding services in furtherance of certain illegal objects. Section 8(b)(4)(ii), 29 U.S.C. § 158(b)(4)(ii), renders it unlawful for unions "to threaten, coerce, or restrain" in furtherance of those objects. This language is pragmatic in its application, looking to the "coercive nature of the conduct," *NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760,* 377 U.S. 58, 68, 84 S.Ct. 1063, 1069, 12 L.Ed.2d 129 (1964), not to the label which it bears. It is, moreover, broad and sweeping. Read correctly, the statute encompasses virtually "any form of economic pressure of a compelling or restraining nature." *Associated General Contractors of California v. NLRB,* 514 F.2d 433, 438 (9th Cir.1975). The strike and the resultant picketing which occurred in this case were clearly proscribed by § 8(b)(4)(i). Although Local 25 contends that such conduct was undertaken only as a means of enforcing the NEJAC award, the Board found otherwise. That finding was plainly supported by substantial—albeit inferential—evidence. A contract clause, however innocuous on its face, cannot be implemented by striking a *secondary* employer. *See En-*

---

**3.** The Board ascertained that Bodeli, on July 17, 1985, had presented all of the relevant facts to the union in the course of the original grievance proceeding before NEJAC. That finding enjoys unblemished record support. Thus, from that date forward at least, Local 25 knew beyond any shadow of a doubt that Sears controlled the

work, that the union's dissatisfaction with the loss of the jobs rested at Sears' doorstep, and that Bodeli, though the immediate employer of the affected dockhands, was a neutral—"secondary"—employer as regards the matter in dispute.

*terprise Ass'n,* 429 U.S. at 520–21, 97 S.Ct. at 899.

A closer question is presented as to the processing and enforcement of grievances. (Although the Board did not pass upon whether the union's grievance handling alone constituted unlawful secondary activity, *see supra* Part II, it did rule that Local 25's "entire course of conduct"—a course of conduct which prominently featured the processing and filing of multiple grievances—was violative of the proscriptions of the Act.) In the union's view, processing grievances under the collective bargaining agreement was classic primary activity addressed not to Local 25's problems with Sears, but to its contractual rights vis-a-vis Bodeli. So, the appellant's argument runs, such conduct could not properly be swept into the Board's § 8(b)(4)(i, ii)(B) bin. We disagree.

In *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the Court held that an employer's prosecution of a retaliatory state court suit against striking employees would amount to an unfair labor practice if filed with an improper motive and without a reasonable basis. *Id.* at 744, 748–49, 103 S.Ct. at 2172–73. *See also Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 896, 104 S.Ct. 2803, 2811, 81 L.Ed.2d 732 (1984). We apply *Bill Johnson's* by analogy here.[4] *Cf. International Longshoremen's and Warehousemen's Union, Local 32 v. Pacific Maritime Ass'n,* 773 F.2d 1012, 1015 (9th Cir. 1985) (applying *Bill Johnson's* test to union's effort to enforce arbitral award), *cert. denied,* —— U.S. ——, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986).

■ The Board found that the principal object of the flood of grievances which inundated Bodeli in the fall of 1985 was to pressure it, though a neutral employer, to "use its influence" on Sears to revive the preexisting work relationship. That finding was tantamount to a finding of improper motivation, for use of the grievance mechanism to achieve such an end is, as the Board ruled, "secondary and violative of § 8(b)(4)(B). [§ 8(b)(4)(i, ii)(B)]" The Board also held that, since three things were crystal clear—Bodeli had no right to control who did the platform work, Local 25 knew as much (at least from July 17, 1985 forward), and the collective bargaining agreement contained no prophylactic provisions protecting the union in the event the work was lost—the grievances were doomed to fail from the very start. It hardly warrants citation of authority to acknowledge that a party which undertakes an action (say, the processing of a stream of grievances) with an awareness of all the relevant facts and without the faintest hope of success on the merits, does so without a "reasonable basis." *See Bill Johnson's,* 461 U.S. at 743–44, 103 S.Ct. at 2170 (no "reasonable basis" if claim "insubstantial" or "baseless"); *cf. Natasha, Inc. v. Evita Marine Charters, Inc.,* 763 F.2d 468, 472 (1st Cir.1985) (appeal frivolous "when the result is obvious, or the arguments are wholly without merit") (citations omitted).

These findings are clearly consistent with the weight of the evidence adduced at the hearing. The scenario seems plain: the union, dismayed at the prospect of Sears' personnel taking over the dock work, chose to exert pressure in a variety of ways upon Bodeli, in the hope of influencing Sears to resume wearing the union label. The grievances—addressed to an employer which was powerless to award the controverted work—were but a tactical gambit, proffered without any basis in fact or in law. The weapons which Local 25 chose to

---

**4.** The grievance procedure is, of course, largely a matter of private contract. Unlike access to the state courts for purposes of suit, the processing of grievances is not implicative of the same concerns of comity, federalism, and First Amendment rights which occupied the attention of the *Bill Johnson's* Court. *E.g.,* 461 U.S. at 741–43, 103 S.Ct. at 2168–70. Thus, a strong argument can be made that the Board's condemnation of the union's course of conduct in this case need not measure up to the stringent *Bill Johnson's* benchmark. Inasmuch as we find that the grievances in this case were filed to achieve an impermissible end and without any reasonable hope of success, *see* text *post,* we simply note the distinction and leave for another day the generic question of whether some other (less rigorous) standard ought to apply when a party to a labor dispute grieves rather than sues for allegedly improper purposes.

employ in its struggle to regain the jobs comprised an assortment of unfairly coercive implements. The Board was well within its rights in holding that the union's course of conduct, including the scattershot filing of a succession of baseless grievances, amounted to the outlawed application of forbidden pressure in derogation of the Act.

## IV. LEFT ON THE LOADING DOCK

The appellant's final argument—that the cease and desist order was overly broad—need not detain us long. The union, though disputing certain findings, at no time excepted to the ALJ's recommended order. It did not seek to have the Board reconsider or modify the order in light of its modest amendment to the ALJ's findings. The law is settled that "no objection that has not been urged before the Board ... should be considered" by a reviewing court. 29 U.S.C. § 160(e). We lack jurisdiction to entertain such an objection *ab initio*. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398 (1982); *International Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975). Thus, we need not—indeed, cannot—substantively consider the fault which the union belatedly seems to have found with the remedial order.

## V. THE END OF THE HAUL

No matter how bent it may be on preserving jobs for its membership, a labor organization cannot simply catch the nearest way. When positions are removed from the marketplace by the act of a third party in circumstances over which a neutral employer has no control, the union cannot go after the latter hammer and tongs, using coercive pressure to try to force the neutral to exert its presumed influence on the employer responsible for the cutback. In this case, when Sears withdrew the work, Local 25, like Yertle, decided the kingdom it ruled was too small:

> I'm ruler, said Yertle, of all that I see.
> But I don't see *enough*. That's the trouble with me.[5]

In its effort to bring the kingdom back to its former size, the union saw too much, and reached across the allowable frontiers into territory where it had no right to prospect.

For the reasons which we have mentioned, we are persuaded that the Board's findings are bottomed upon substantial evidence in the record as a whole. There has been no cognizable error of law. Since the findings must stand, the remedial order—as to which no proper exception was taken—must likewise stand. Thus, we need go no further. Local 25's petition for review is denied and dismissed, the NLRB's cross-application is granted, and its order is

*Enforced.*

---

**5.** Theodor Suess Geisel (a/k/a Dr. Suess), *Yertle the Turtle and Other Stories* (Random House 1958) (emphasis in original).